472 S.E.2d 411

The **WEST VIRGINIA HEALTH CARE COST REVIEW AUTHORITY,**
Appellee,

v.

**BOONE MEMORIAL HOSPITAL,**
Appellant.

No. 23035.

Supreme Court of Appeals of West Virginia.

Submitted April 24, 1996.

Decided May 17, 1996.

Marianne K. Stonestreet, General Counsel, Sallie H. Tweel, Assistant General Counsel, Charleston, for Appellee.

James W. Thomas, Jackson & Kelly, Charleston, for Appellant.

CLECKLEY, Justice.

The appellant herein, Boone Memorial Hospital (Hospital), appeals the December 29, 1994, order of the Circuit Court of Kanawha County which held the Hospital's proposed stationary computerized tomography (CT) service is subject to Certificate of Need (CON) review. In so determining, the circuit court reversed the June 9, 1994, administrative decision of the Office of Hearings and Appeals of the West Virginia Department of Tax and Revenue (OHA) which held the proposal is not subject to CON review. OHA had reversed the November 16, 1993, decision of the West Virginia Health Care Cost

Review Authority (HCCRA),[1] the appellee herein, and held HCCRA exceeded its statutory authority by finding the proposal is subject to CON review. The primary issue on appeal is whether HCCRA has jurisdiction over the proposed CT service. For the following reasons, we affirm.

## I.

## FACTUAL AND PROCEDURAL HISTORY

By letter dated October 14, 1993,[2] the Hospital requested a determination of reviewability for a proposed stationary CT unit. *See* 65 W.Va. C.S.R. 7, § 25.2 (1992).[3] In its letter, the Hospital stated that since 1985 it had contracted for a mobile CT unit which provided its patients CT services one day per week. In August of 1993, the Hospital was notified by its vendor that its mobile services would be discontinued. After mobile services ceased, it became necessary to transfer

patients in need of CT services to Charleston Area Medical Center which the Hospital asserted was significantly more expensive than on-site services. Thus, the Hospital proposed to enter into a purchased services agreement with US Medical Management II(USM) for a stationary CT unit.

The Hospital stated it would provide staffing, board certified CT radiology services, and all medical supplies for the unit's operation. It also would purchase the CT services for a flat fee per scan. In turn, USM would be responsible for the total capital expenditure for the stationary unit at a cost of $296,800. The Hospital emphasized this amount is less than the $300,000 threshold to constitute the acquisition of major medical equipment as defined in W. Va.Code, 16–2D–2(q) (1991),[4] and the acquisition did not constitute a "new institutional health service" as set forth in W. Va.Code, 16–2D–3 (1993), specifically W. Va.Code, 16–2D–3(e) and –3(h),[5] and 65 W. Va.C.S.R. 7, § 2.14 (1992).[6]

---

1. HCCRA was created pursuant to W.Va.Code, 16–29B–1, *et seq.*

2. The request was resubmitted on October 21, 1993, because a "verified notice" previously was omitted.

3. 65 W. Va.C.S.R. 7, § 25.2 states: "Any person acquiring, offering or developing an institutional health service may apply to the board for a ruling regarding reviewability of the proposed institutional health service."

4. W. Va.Code, 16–2D–2(q), in relevant part, provides: " 'Major medical equipment' means a single unit of medical equipment or a single system of components with related functions which is used for the provision of medical and other health services and which costs in excess of three hundred thousand dollars[.]" Amendments made to W. Va.Code, 16–2D–2, in 1995 do not affect subsection (q).

5. W. Va.Code, 16–2D–3, states, in part:
   "Except as provided in section four [§ 16–2D–4] of this article, any new institutional health service may not be acquired, offered or developed within this state except upon application for and receipt of a certificate of need as provided by this article. Whenever a new institutional health service for which a certificate of need is required by this article is proposed for a health care facility for which, pursuant to section four of this article, no certificate of need is or was required, a certificate of need shall be issued before the new institutional health service is offered or developed.... For

purposes of this article, a proposed 'new institutional health service' includes:
   * * * * * *
   "(e)(1) The addition of health services which are offered by or on behalf of a health care facility or health maintenance organization and which were not offered on a regular basis by or on behalf of the health care facility or health maintenance organization within the twelve-month period prior to the time the services would be offered ...
   * * * * * *
   "(h) The acquisition of major medical equipment[.]"
   The introductory paragraph of W. Va.Code, 16–2D–3, was amended in 1995.

6. 65 W. Va.C.S.R. 7, § 2.14 provides, in relevant part:
   " 'Proposed New Institutional Health Service' means:
   * * * * * *
   "(c) Any obligation for a capital expenditure incurred by or on behalf of a health care facility, ... except as exempted by this rule, in excess of the expenditure minimum ...;
   * * * * * *
   "(e) The addition of health services which are offered by or on behalf of a health care facility ... and which were not offered on a regular basis by or on behalf of such health care facility ... within the twelve-month period prior to the time such services would be offered;
   * * * * * *
   "(h) The expansion of any of the following health services, whether or not the expansion

Furthermore, the Hospital argued the projected annual operating expenses of $93,-930.54 associated with the CT services are below the $300,000 threshold contained within 65 W. Va.C.S.R. 7, § 2.9 (1992).[7] Therefore, the Hospital requested HCCRA find the proposal not subject to CON review because the project did not meet the regulatory requirements for CON reviewability and it did not require an exemption review.

In its decision dated November 16, 1993, HCCRA disagreed. It relied upon the State Health Plan Standards for Certificate of Need (State Health Plan Standards) approved on October 5, 1992, to determine "that new/additional stationary CT services meet certain criteria." HCCRA determined "the intent of these Standards is that proposals for new/additional stationary CT units will be viewed as new institutional health services under W. Va.Code § 16–2D–3(e)."[8] Thus, HCCRA found the proposal to be subject to CON review. The Hospital appealed this decision to OHA. *See* W. Va.Code, 16–29B–13 (1983).

The Hospital argued before OHA, as it also does in the present appeal, that the CT services are not being offered as a "new institutional health service" under the plain language of W. Va.Code, 16–2D–3(e). "[W]hen used in connection with health services," to "offer" is defined as a "health care facility or health maintenance organization hold[ing] itself out as capable of providing, or as having the means for the provision of, specified health services." W. Va.Code, 16–2D–2(t) (1991). In addition, W. Va.Code, 16–2D–2(*l*) (1991), defines "health services" as "clinically related preventive, diagnostic, treatment or rehabilitative services[.]" The Hospital states it is beyond dispute that CT services were offered at the Hospital during the preceding twelve-month period.

The Hospital also asserted below, as it does here, "that the State Health Plan Standards fail to confer jurisdiction or authority for HCCRA's decision." On the other hand, HCCRA argued that CON review was necessary under "current law" and W. Va.Code, 16–2D–3(e), because the Hospital was switching from a mobile part-time unit which had not undergone CON review to a stationary full-time unit. Relying upon the State Health Plan Standards, HCCRA points to the fact that the State Health Plan Standards define stationary and mobile CT services differently.[9] It also quotes other language it argues evidences a distinction between mobile and stationary CT services.[10] The Hospital not only claims HCCRA cannot obtain its jurisdiction from another agency's promulgation of the State Health Plan Standards but, regardless of that fact, "[t]he State Health Plan exists to define criteria for

is associated with a capital expenditure: ... computed tomography (CT) equipment. . . .
"(i) The acquisition of major medical equipment[.]"

7. 65 W. Va.C.S.R. 7, § 2.9, defines an "Expenditure Minimum for Annual Operating Costs" as an expenditure of "three hundred thousand dollars for each twelve month period following the date upon which a new institutional health service is acquired, offered, or developed and for each twelve (12) month period thereafter."

8. *See* note 5, *supra*.

9. In the State Health Plan Standards at 98, a stationary CT service means "[a] diagnostic service using computed tomography with a fixed CT scanner." A mobile CT service means "[a] diagnostic service using computed tomography with a mobile CT scanner at two or more entity sites. Mobile CT scanners are currently eligible, under statute, for exemption from CON review."

10. HCCRA quotes the following language:
"A. *New/Additional CT Services:*
\* \* \* \* \* \*
"2. If an existing provider of mobile CT services is located at a site more than thirty (30) minutes travel time from all existing station-ary CT units or is the sole provider of CT services in the county, the following criteria must be met in order for an application to provide stationary CT services to be approved:
"a. The site where the stationary CT unit will be located must operate a 24 hour emergency room and be designated as a Level III Trauma Center;
"b. The CT services must be supervised by a full-time board-certified radiologist, as described under Section IV(B) of this standard;
"c. The applicant must provide a statement from the radiology group of the nearest secondary or tertiary hospital agreeing to accept CT readings from the applicant; and
"d. The applicant must demonstrate that providing stationary CT services will not result in an increase in costs or charges per CT scan."
State Health Plan Standards at 98–99.

otherwise reviewable transactions, not to define reviewability in the first instance."

The State Health Plan Standards were created by the West Virginia Health Care Planning Commission (Commission) which the Legislature gave "all powers necessary or appropriate to carry out the health planning purposes of this article [W. Va.Code, 16–1A–1, *et seq.*], said powers being related to developing a comprehensive state health plan." W. Va.Code, 16–1A–3 (1991). The Commission was created within the Governor's office, and the Governor was given the power to designate and appoint its members. W. Va.Code, 16–1A–3. Among other things, the Commission was charged with the responsibility to develop and present to the Governor before July 1, 1992, "proposed amendments and modifications to the certificate of need standards contained in the state health plan heretofore approved by the governor." W. Va.Code, 16–1A–5(c) (1991). The Governor has the authority to then approve or disapprove of the amendments and modifications. W. Va.Code, 16–1A–5(c).

In its decision, OHA found HCCRA never cited "current law" and never quoted subsection 3(e) but, instead, HCCRA relied upon the State Health Plan Standards for CT services to support its position that CON review was necessary for the Hospital's proposed CT services. OHA determined the State Health Plan Standards could not confer jurisdiction or authority to HCCRA because "an administrative agency, being a creature of statute, has no authority except as conferred by statute enacted by the West Virginia Legislature." Therefore, OHA concluded "[t]he statutory authority and jurisdiction of an agency cannot be expanded by the actions of another agency.... Standards developed by the ... Commission cannot confer jurisdiction or authority for HCCRA to mandate

CON review on an otherwise nonreviewable activity." OHA stated HCCRA did not even respond to the Hospital's argument that the plain meaning of W. Va.Code, 16–2D–3(e), governed the appeal. In addition, OHA determined the fact the Hospital's mobile CT unit never was subjected to CON review was of no consequence. Based on the foregoing, OHA held "the Hospital's proposed provision of stationary CT services is not a new institutional health service within the plain meaning of W. Va.Code § 16–2D–1, *et seq.* ... [and, thus,] not subject to CON review."

HCCRA appealed this decision to the Circuit Court of Kanawha County. The circuit court found that the 1991 legislative session led to the filing of emergency rules by HCCRA on June 17 and 24, 1991, which made stationary CT services subject to CON review, but gave mobile shared CT services an exemption. These rules remained in effect until April 10, 1992, when they were made permanent rules after they were approved by the Legislature in an omnibus bill. 65 W. Va.C.S.R. 7, § 1, *et seq.*,[11] and 65 W. Va.C.S.R. 16, § 1, *et seq.*[12] The circuit court also found that the State Health Plan Standards define and treat mobile and stationary CT services separately and "[i]t was appropriate for the HCCRA to look to the standards found in the State Health Plan in its determination." As support, the circuit court cited W. Va.Code, 16–29B–11 (1987), which states, in part: "In making decisions in the certificate of need review process, the board shall be guided by the state health plan approved by the Governor." The circuit court also cited *Laurel Mobile Health Services, Ltd. v. Commonwealth of Pennsylvania, Department of Health,* 121 Pa.Cmwlth. 291, 550 A.2d 616 (1988).

In *Laurel,* the Pennsylvania Department of Health issued a CON for a mobile CT unit, to be shared between two hospitals. Later,

---

**11.** Specifically, see 65 W. Va.C.S.R. 7, § 2.14, note 6, *supra.*

**12.** 65 W. Va.C.S.R. 16, § 1, *et seq.,* sets forth exemptions for shared services. 65 W. Va.C.S.R. 16, § 3.1 (1992), provides, in part:

"Any acute care facility otherwise subject to the certificate of need program may obtain an exemption from certificate of need review for

shared services between two (2) or more acute care facilities. The shared services must be those provided by major medical equipment and through existing technology can reasonably be made mobile. The major medical equipment which is eligible for this exemption is ... computerized tomography (CT) scanners."

one of the hospitals requested a stationary CT unit, and the vendor of the mobile unit objected. 550 A.2d at 617. The Department of Health said the hospital could obtain the stationary CT unit without CON review. 550 A.2d at 617–18. The only issue addressed on appeal was whether the Department of Health violated the Health Care Facilities Act (Act) in that the hospital failed to proceed as a request for an amendment to the original CON issued. In reversing the Department of Health's decision, the court found the Act provided: " 'An application for a certificate of need shall be recommended, approved and issued when the application substantially meets the requirements listed below: provided that each decision ... shall be consistent with the State health plan....' " 550 A.2d at 619. (Citation omitted; ellipses in *Laurel* ). The court said there was no evidence in the record the Department reviewed the Pennsylvania State Health Plan or other criteria of the Act. 550 A.2d at 619. Indeed, if the Department had followed the Pennsylvania State Health Plan, a CON review would be required because it states that a change from shared to independent status constitutes a change or amendment to an original CON approval, and, therefore, it is reviewable. 550 A.2d at 619. This fact, combined with a variety of other reasons, caused the court to reverse the Department's decision and order the hospital to proceed as a request for an amendment to the original CON. 550 A.2d at 621.

In the present case, the circuit court relied specifically upon W. Va.Code, 16–2D–3(e), 65 W. Va.C.S.R. 16, § 1, *et seq.*, the State Health Plan, and *Laurel* in holding HCCRA properly decided a change from shared mobile CT services to stationary CT services is an "addition of health services which were not offered by or on behalf of a health care facility within the previous twelve-month period, and is therefore a new institutional health service, and subject to CON review, pursuant to West Virginia Code § 16–2D–3(e)." Thus, the circuit court reversed the decision of OHA, finding it amounted to an abuse of discretion and substitution of the

"informed judgment" of HCCRA. The circuit court stated the decision resulted in a "clearly unwarranted exercise of discretion in excess of [OHA's] statutory authority." The present appeal by the Hospital ensued.

## II.

### DISCUSSION

The Hospital argues the circuit court erred by finding: (1) the proposed stationary unit was subject to CON review pursuant to W. Va.Code, 16–2D–3(e); (2) HCCRA could obtain jurisdiction by virtue of the State Health Plan Standards; (3) unspecified legislative changes in 1991 and the subsequent adoption of 65 C.S.R. 7, § 1, *et seq.*, and 65 C.S.R. 16, § 1, *et seq.*, support HCCRA's jurisdiction; (4) the Pennsylvania CON decision supports jurisdiction; and (5) HCCRA acted within its discretion when it issued its original decision. In the pages that follow, we will explore the pertinent statutory framework, recount the proceedings to date, and then examine the five-pronged challenge. When all is said and done, we find each remonstrance of the Hospital unpersuasive. Thus, we deny the Hospital the relief requested and leave Legislative Rules 65 C.S.R. 7, § 1, *et seq.*, and 65 C.S.R. 16, § 1, *et seq.*, intact.

The ultimate question for this Court to determine is whether W. Va.Code, 16–2D–3(e), is ambiguous or silent with regard to whether the Hospital's proposal constitutes a "new institutional health service." If the proposal clearly is covered by this statute, we need not go any further because jurisdiction would not be at issue and the proposal either would or would not be subject to CON review by virtue of the statute. However, if the statute is ambiguous or silent, the next question for this Court to address is whether the Legislature has committed the statute to the agency for purposes of administration, and, if so, whether the legislative rules, specifically 65 W. Va.C.S.R. 7, § 1, *et seq.*, and 65 W. Va.C.S.R. 16, § 1, *et seq.*, extinguish the ambiguity or fill the gap. If the ambiguity or gap remains after examining the legislative rules, the final question for this Court to address is whether it is appropriate to look to other sources, namely the State Health

Plan Standards and case law, to derive HCCRA's jurisdiction.

### A.

### *Standard of Review*

■ Once again our standard of review analysis begins with a nod in the direction of *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The rule of deference traditionally applies when an agency's interpretation is a "product of delegated authority for rulemaking," *Stinson v. United States*, 508 U.S. 36, 44, 113 S.Ct. 1913, 1918, 123 L.Ed.2d 598, 607 (1993); a sphere that ordinarily encompasses legislative rules and agency adjudication. Here, HCCRA's interpretation of the law is embodied in a legislative rule and an adjudication. However, courts customarily withhold *Chevron* deference from agencies litigating positions. *In re Snuffer*, 193 W.Va. 412, 417, 456 S.E.2d 493, 498 (1995) (Cleckley, J., concurring). We see no reason to take a different tack in this instance.

■ Judicial review of HCCRA's decisions is controlled by W. Va.Code, 16–29B–13. Pursuant to this section, OHA was designated by the Governor to serve as the review agency for CON decisions. W. Va. Code, 16–29B–13(a); *see also* W. Va.Code, 16–2D–10(a) (1981). In part, W. Va.Code, 16–29B–13(b), provides "the review agency . . . shall review appeals in accordance with the provisions governing the judicial review of contested administrative cases" contained within W. Va.Code, 29A–5–4 (1964), of the Administrative Procedures Act (APA).[13] *See also* W. Va.Code, 16–2D–10(b) (1981). OHA's decision is to be regarded as the final decision of HCCRA.[14] If HCCRA's and OHA's determinations are inconsistent, any affected party may appeal the decision to the Circuit Court of Kanawha County. W. Va. Code, 16–29B–13(f). Review by the circuit court also must be performed in compliance with W. Va.Code, 29A–5–4. W. Va.Code, 16–29B–13(f).[15]

■ In Syllabus Point 1 of *St. Mary's Hospital v. State Health Planning and Development Agency*, 178 W.Va. 792, 364 S.E.2d 805 (1987), we stated:

"'Upon judicial review of a contested case under the West Virginia Administrative Procedure[s] Act, Chapter 29A, Article 5, Section 4(g), the circuit court may affirm the order or decision of the agency or remand the case for further proceedings. The circuit court shall reverse, vacate or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decisions or order are "(1) In violation of constitutional or statutory provisions; or (2) In excess of the statutory authority or jurisdiction of the agency; or (3) Made upon unlawful procedures; or (4) Affected by other error of law; or (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."' Syl. Pt. 2, *Shepherdstown Volunteer Fire Department v. Human Rights Commission*, 172 W.Va. 627, 309 S.E.2d 342 (1983)."

We review the circuit court's order *de novo*, applying the same "clearly wrong" and "arbitrary and capricious" standards as did the

---

13. W. Va. 29A–1–1, *et seq.*

14. W. Va.Code, 16–29B–13(e), states: "The decision of the review agency shall be considered the final decision of the board; however, the review agency may remand the matter to the board for further action or consideration." *See also* W. Va.Code, 16–2D–10(e) (1981). The "board" is defined in W. Va.Code, 16–29B–3(c) (1991), as "the three member board of directors of the West Virginia health care cost review authority, an autonomous division within the state department of health[.]"

15. We are concerned only with the rules and regulations of HCCRA and not those of OHA's. To give OHA a more prominent presence in the rulemaking process would distort the statutory alignment by grossly underestimating HCCRA's role and aggrandizing OHA's importance. In crafting the statutes, the Legislature delegated unusually great authority to HCCRA including the power to write *additional* rules and regulations. In contrast, we believe the Legislature assigned to OHA a purely advisory function.

circuit court. Under the Administrative Procedures Act, "the task of the circuit court is to determine 'whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Frymier–Halloran v. Paige*, 193 W.Va. 687, 695, 458 S.E.2d 780, 788 (1995) *quoting Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136, 153 (1971). However, these deferential standards have no application if an agency's decision is based upon a mistaken impression of the legal principles involved. Under such circumstances, the findings and conclusions of an agency will be accorded diminished respect on appeal.

We recently stated in Syllabus Point 1 of *Appalachian Power Co. v. State Tax Department of West Virginia*, 195 W.Va. 573, 466 S.E.2d 424 (1995): "Interpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review." We further said "[a]n inquiring court—even a court empowered to conduct *de novo* review—must examine a regulatory interpretation of a statute by standards that include appropriate deference to agency expertise and discretion." 195 W.Va. at 582, 466 S.E.2d at 433. However, deference only should be given to an agency's construction of a statute or legislative rule if the legislative intent is not clear. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. at 842–43, 104 S.Ct. at 2781, 81 L.Ed.2d at 703; *Sniffin v. Cline*, 193 W.Va. 370, 374, 456 S.E.2d 451, 455 (1995).

Our review of HCCRA's legislative rules is limited to asking (1) whether they were enacted pursuant to the procedures required by law; and (2) whether HCCRA's interpretation and application of the rules were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. An agency's interpretation of a statutory provision or regulation it is charged

with administering is entitled to a high degree of deference. Court's must, however, reject administrative orders and rules that are contrary to legislative intent.[16]

### B.

#### *Analysis*

This case turns on a question of statutory interpretation. Although the parties concentrate their effort on the intent and direction of W. Va.Code, 16–2D–3(e), we believe the dispositive issue concerns the validity and interpretation of Legislative Rule 65 W. Va. C.S.R. 7, § 2.14(h).[17] As will be discussed more fully below, we find that Legislative Rule 2.14(h) provides HCRRA with the necessary jurisdiction to require the CON review that is in controversy on this appeal.

▬▬ Our research indicates that Legislative Rules 65 W. Va.C.S.R. 7, § 1, *et seq.*, was passed as part of omnibus bill legislation. In *Kincaid v. Mangum*, 189 W.Va. 404, 432 S.E.2d 74 (1993), we condemned this manner of legislating as unconstitutional but indicated the ruling was to be applied only prospectively. As to legislative rules adopted as part of an omnibus bill before the *Kincaid* decision, as the one under consideration *sub judice*, *Kincaid* holds we are precluded from giving it controlling weight without first giving it careful scrutiny. In *Appalachian Power Co.*, *supra*, we slightly altered *Kincaid* but, nevertheless, chose to adopt the "careful scrutiny" standard as part of our *Chevron* analysis. 195 W.Va. at 585, 466 S.E.2d at 436. Today, however, we further explicate *Kincaid* and declare that in future cases, unless specific procedural or substantive infirmities are brought to our attention, we will no longer presume invalid legislative rules adopted prior to *Kincaid* merely because they were enacted as part of omnibus legislation. What we suggested in *Appalachian*

---

**16.** Moreover, deference should not be given to an agency's interpretation if it extends beyond what the meaning of the statute can sustain. *Pittston Coal Group v. Sebben*, 488 U.S. 105, 113, 109 S.Ct. 414, 420, 102 L.Ed.2d 408, 419–20 (1988); *In re Snuffer*, 193 W.Va. at 417, 456 S.E.2d at 498 (1995) (Cleckley, J., concurring). The problem is complicated by a realization that almost any administrative action can be described by a

challenger as either exceeding an agency's authority or overstepping the authorized application of an agency's authority. *See generally* Thomas W. Merrill, *Judicial Deference to Executive Precedent*, 101 Yale L.J. 969, 997–98 (1992).

**17.** *See* note 6, *supra*.

*Power Co.*, 195 W.Va. at 585, 466 S.E.2d at 436, we now hold:

"[o]nce a disputed regulation is legislatively approved, it has the force of a statute itself.... Being an act of the West Virginia Legislature, it is entitled to more than mere deference; it is entitled to controlling weight. As authorized by legislation, a legislative rule should be ignored only if the agency has exceeded its constitutional or statutory authority or is arbitrary or capricious."

While we recognize interpretive analysis of omnibus legislation is to be conducted with great caution, unless specific procedural or substantive infirmities are proven, the case-by-case "careful scrutiny" standard cannot justify the expense of judicial resources required for its implementation. Thus, we are reluctant to interpret *Kincaid* to mandate pointless expenditure of effort. If the language of an enactment is clear and within the constitutional authority of the law-making body which passed it, courts must read the relevant law according to its unvarnished meaning, without any judicial embroidery. Even when there is conflict between the legislative rule and the initial statute, that conflict will be resolved using ordinary canons of interpretation. In this regard, it is a settled principle of statutory construction that courts presume the Legislature drafts and passes statutes with full knowledge of existing law. *See State ex rel. Smith v. Maynard*, 193 W.Va. 1, 8–9, 454 S.E.2d 46, 53–54 (1994), *citing Cannon v. University of Chicago*, 441 U.S. 677, 696–97, 99 S.Ct. 1946, 1957–58, 60 L.Ed.2d 560, 575–76 (1979); *see also Miles v. Apex Marine Corp.*, 498 U.S. 19, 32, 111 S.Ct. 317, 325, 112 L.Ed.2d 275, 291 (1990). Accordingly, when two statutes conflict, the general rule is that the statute last in time prevails as the most recent expression of the legislative will. Syl. Pt. 2, *Stamper by Stamper v. Kanawha County Bd. of Educ.*, 191 W.Va. 297, 445 S.E.2d 238 (1994); Syl. Pt. 2, *State ex rel. Dept. of Health and Human Resources, etc. v. West Virginia Public Employees Retire-*

*ment System*, 183 W.Va. 39, 393 S.E.2d 677 (1990).

Applying this standard of review to the legislative rule in question, we would have no hesitancy in holding the circuit court's decision must be affirmed. By its terms, Legislative Rule 65 W. Va.C.S.R. 7, § 2.14(h), provides that a "Proposed New Institutional Health Service" includes any "expansion of ... computed tomography (CT) equipment[.]" In addition, Legislative Rule 65 W. Va.C.S.R. 7, § 3.1 (1992), provides, in part: "No new institutional health service may be acquired, offered or developed within this state unless the board has issued a certificate of need[.]" Consequently, if we were to start and stop with the new standard that we adopt today, HCRRA would be home free. However, this new standard looks to future cases, and our prior precedent does not permit us to confine this case to such narrow margins.

The "careful scrutiny" standard, at the minimum, suggests that the chief objective of statutory interpretation is to give effect to legislative will. To achieve this objective, a court must take into account the tactical assumptions that underlie a legislative rule's enactment, including not only general policies but also preexisting statutory provisions. Put simply, courts must recognize that when considering omnibus bill enactments, the Legislature does not legislate in a vacuum. Therefore, we must proceed to evaluate Legislative Rule 65 W. Va.C.S.R. 7, § 2.14 under our *Chevron* analysis.[18]

Taking this haploscopic view brings us immediately to Syllabus Points 3 and 4 of *Appalachian Power Co.*, where we more explicitly stated:

"3. Judicial review of an agency's legislative rule and the construction of a statute that it administers involves two separate but interrelated questions, only the second of which furnishes an occasion for deference. In deciding whether an administrative agency's position should be sustained, a reviewing court applies the standards set out by the United States Supreme Court in

---

18. Although *Appalachian Power Co.* dealt with legislative rules of the West Virginia Tax Department, the approach is equally applicable to the facts and circumstances of this case.

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The court first must ask whether the Legislature has directly spoken to the precise question at issue. If the intention of the Legislature is clear, that is the end of the matter, and the agency's position only can be upheld if it conforms to the Legislature's intent. No deference is due the agency's interpretation at this stage."

"4. If legislative intent is not clear, a reviewing court may not simply impose its own construction of the statute in reviewing a legislative rule. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. A valid legislative rule is entitled to substantial deference by the reviewing court. As a properly promulgated legislative rule, the rule can be ignored only if the agency has exceeded its constitutional or statutory authority or is arbitrary or capricious. W. Va.Code, 29A-4-2 (1982)."

We review challenges to an agency's construction of its organic statute under *Appalachian Power Co.*. Thus, within this analytical framework, our initial inquiry must be whether W. Va.Code, 16–2D–3(e), is clear. In order for this Court to affirm HCCRA's interpretation of W. Va.Code, 16–2D–3, we must either hold that HCCRA gave effect to the intent of the Legislature or, in the alternative, that the statute is silent or inherently ambiguous making HCCRA's interpretation reasonable and worthy of deference. The rule of construction supporting HCRRA is apposite only when the Legislature has blown an uncertain trumpet. If ambiguity or silence does not loom, the occasion for preferential interpretation never arises. Under *Appalachian Power Co.*, however, we defer to an agency's reasonable interpretation of a statute it administers unless the intent of the statute is clear. 195 W.Va. at 582, 466 S.E.2d at 433. In other words, we are obligated to defer to an agency's view only when there is a statutory gap or ambiguity.

The threshold inquiry under *Appalachian Power Co.* is whether the Legislature has spoken directly to the precise issue in question. *See INS v. Cardoza–Fonseca*, 480 U.S. 421, 449, 107 S.Ct. 1207, 1222, 94 L.Ed.2d 434, 458–59 (1987) (using "ordinary canons of statutory construction" to determine whether the Legislature had a clear intent). When this Court finds the terms of a statute unambiguous, judicial inquiry is complete. In such a case, the statutory language must be regarded as conclusive. Thus, our interpretive task begins by examining the language of the statute.

W.Va.Code, 16–2D–3, begins by requiring that "any new institutional health service" obtain a CON from HCCRA before providing such services unless it is otherwise exempt. The statute lists nine different ways that a "proposed 'new institutional health service'" may be determined. Specifically, and pertinent to this case, W. Va.Code, 16–2D–3, provides:

"For purposes of this article, a proposed 'new institutional health service' includes:

\*　　\*　　\*　　\*　　\*　　\*

"(e)(1) The addition of health services which are offered by or on behalf of a health care facility ... and *which were not offered on a regular basis* by or on behalf of the health care facility ... within the twelve-month period prior to the time the services would be offered[.]" (Emphasis added).

Absent specific statutory definitions, words in a statute are presumed to have their ordinary and common meaning. Syl. Pt. 3, *Byrd v. Board of Educ. of Mercer County*, 196 W.Va. 1, 467 S.E.2d 142 (1995); *Metropolitan Prop. and Liab. Ins. Co. v. Acord*, 195 W.Va. 444, 450, 465 S.E.2d 901, 907 (1995). Without a limiting context, the phrase "which were not offered on a regular basis" appears to be ambiguous considering the facts of this case. "Regular" commonly means conforming to a consistent plan. Thus, construing "regular" according to its "ordinary meaning" cannot be dispositive of our inquiry.[19]

---

**19.** The terms "plain" and "clear" are "frequently employed to characterize language of seemingly unambiguous clarity. While easily understood as denoting the unquestioned meaning of a text,

The language of the statute is only the beginning point. To determine legislative intent, we start with the text of the statute in question and then move "to the structure and purpose of the Act in which it occurs." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, ___ U.S. ___, ___, 115 S.Ct. 1671, 1677, 131 L.Ed.2d 695, 705 (1995). (Citation omitted). Indeed, statutory interpretation "is a holistic endeavor ... and, at a minimum, must account for a statute's full text, language as well as punctuation, structure and subject matter." *United States Nat'l Bank of Or. v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 455, 113 S.Ct. 2173, 2182, 124 L.Ed.2d 402, 418 (1993). (Internal quotations and citations omitted). It is a fundamental principle of statutory construction that the meaning of a word cannot be determined in isolation, but it must be drawn from the context in which it is used. *Randolph County Bd. of Educ. v. Adams*, 196 W.Va. 9, 16, 467 S.E.2d 150, 157 (1995); *Kittle v. Icard*, 185 W.Va. 126, 133, 405 S.E.2d 456, 463 (1991). Often, "the meaning of a word that appears ambiguous if viewed in isolation [will] become clear when the word is analyzed in light of the term that surrounds it." *Smith v. United States*, 508 U.S. 223, 229, 113 S.Ct. 2050, 2054, 124 L.Ed.2d 138, 149 (1993).

We find the language of W. Va.Code, 16–2D–3(e)(1), does not clearly resolve whether the jurisdiction of HCCRA extends to the facts of this case. In other words, we find the language of W. Va.Code, 16–2D–3(e), "which were not offered on a regular basis," sufficiently ambiguous as to require interpretation. Consequently, we conclude the Legislature has expressed no clear intent regarding the meaning of "offered on a regular basis" in the statute.[20]

Our next task is to determine the extent of HCCRA's power. Therefore, we are required to ascertain whether the Legislature has granted HCCRA express or implied authority to implement W. Va.Code, 16–2D–3(e). We find HCRRA has been delegated such authority. W. Va.Code, 16–2D–5(a) (1993),[21] expressly empowers HCCRA to administer the CON program, and W. Va.Code, 16–2D–8 (1985), explicitly empowers HCCRA to promulgate additional rules and regulations pursuant to W. Va.Code, 29A–1–1, *et seq.*, to carry out the provisions of this article.

As a reviewing court, we give great deference to an agency with regard to the scope of its authority. Moreover, these statutes clearly authorize HCCRA to issue implementing regulations. Therefore, HCCRA's interpretation of the phrase "which were not offered on a regular basis" is controlling unless arbitrary, capricious, or manifestly contrary to statute. *See Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2782, 81 L.Ed.2d at 703 (addressing explicit delegations of authority to an agency). Although a court gives appropriate deference to an agency's interpretation of an ambiguous statute that the agency is charged by regulation to administer, that deference does not permit abdication of the judicial responsibility to determine whether a challenged regulation is contrary to statute or devoid of administrative authority. *Appalachian Power Co.*, 195 W.Va. 589, 466 S.E.2d at 440 ("[j]udicial review must not become judicial abdication, and we must carefully consider each case to determine whether deference is warranted and, if so, how much to accord").

HCCRA established the criteria for determining whether a hospital is seeking to provide a "New Institutional Health Service"

[these terms] often prove[ ] difficult to apply as used in specific individual cases. Seldom does language carry one true and undisputed meaning." *See Tabion v. Mufti*, 73 F.3d 535, 537 (4th Cir.1996). The phrase "which were not offered on a regular basis" is no exception.

**20.** It is understandable that all the answers to every relevant question are not provided by the statute. The West Virginia Legislature does not have to be omniscient in its draftsmanship of a

statute. Most statutes resolve a portion of the problem leaving other issues for future resolution by the Executive Branch. A presumption the Legislature has resolved every question, with answers to be found if only the judiciary can look with a powerful loupe, would leave no room for the exercise of delegated power.

**21.** Changes made to W. Va.Code, 16–2D–5, in 1995 did not affect subsection (a).

within the meaning of W. Va.Code, 16–2D–3, by adopting Legislative Rules 65 W. Va. C.S.R. 7, § 1, *et seq.* As previously mentioned, Rule 2.14 states specifically that "'Proposed New Institutional Health Service' means: ... (h) The *expansion* of any of the following health services, whether or not the expansion is associated with a capital expenditure; ... computed tomography (CT) equipment[.]" (Emphasis added).[22] Simply put, Legislative Rule 2.14(h) provides that a proposed *expansion* of computed tomography (CT) equipment is "[t]he addition of health services ... which were not offered on a regular basis[.]" W. Va.Code, 16–2D–3(e). We need at this juncture only to determine whether the above regulation is reasonable. As suggested above, if legislative intent or direction is unclear, courts should defer to an implementing agency's interpretation of the statute, as long as that interpretation is reasonable. Under *Appalachian Power Co.,* HCCRA's construction must be sustained if it falls within the range of permissible construction. Our job is not to weigh the wisdom of, nor to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by an agency in interpreting and applying a statute. Moreover, it is not necessary for us to find that the regulation is the only reasonable one or even that it is the result we would have reached had the question arisen in the first instance in this Court.

Upon review, we find HCCRA's approach is reasonable and should not be disturbed by a reviewing court. Although a wily lawyer could perhaps argue that the unembellished term "regular basis" refers only to a consistent and planned course of services and not the frequency and amount of services offered, we conclude that the Legislature more likely intended the statute to be read as HCCRA urges. This interpretation is plausible and serves the ends that the Legislature sought to achieve. The baseline assumption always must be that an enacted statute should be construed to achieve an effective

and operative result, and we will not lightly presume the Legislature and HCRRA lost sight of so abecedarian a principle. Although HCCRA certainly could have chosen to judge what was a "New Institutional Health Service" on a case-by-case basis, we have no doubt it is equally authorized to interpret the phrase through rulemaking. After all, the decision whether to proceed by rulemaking or adjudication lies within the agency's discretion, and the Legislature imposed few restraints on the exercise of this discretion. In short, we are faced with an explicit delegation of authority without clear legislative guidance. In the absence of a persuasive argument the legislative rule is arbitrary and capricious, we defer to the regulation and HCCRA's application of it.

Although the rules of statutory construction do not require us to proceed further, it again must be underscored that 65 W. Va. C.S.R. 7, § 1, *et seq.,* is more than interpretive;[23] it is a series of rules expressly approved by the Legislature. If we were dealing only with an interpretive rule, the failure to revise, unaccompanied with any evidence of legislative awareness of the interpretation, is not persuasive evidence of legislative approval. *See Girouard v. United States,* 328 U.S. 61, 69, 66 S.Ct. 826, 830, 90 L.Ed. 1084, 1090 (1946) ("[i]t is at best treacherous to find in [legislative] silence alone the adoption of a controlling rule of law"). This case, however, is not a situation in which there is mere legislative passivity. Here, we have abundant evidence that the Legislature both contemplated and authorized the previous interpretation as a formal legislative rule. To be specific, we deal with a demonstrated legislative contemplation and a clearer expression of legislative intent to add a new or better definition of a "New Institutional Health Service." The only reasonable conclusion that can be drawn from this later decision to broaden the definition is that the Legislature concurred in HCCRA's desire to bring about alteration or, at least, clear up

---

**22.** *See* note 6, *supra.*

**23.** Administrative regulations that are deemed only interpretive if promulgated in response to express delegations of authority, like the one at issue here, are given controlling weight unless

they are arbitrary, capricious, or manifestly contrary to statute. *See* 1A Norman J. Singer, *Sutherland Statutory Construction* § 31.06 (5th ed. 1992).

the ambiguity. We find legislative acquiescence overwhelming where the Legislature has revisited the language in reviewing the administrative interpretation and authorizing its promulgation as a legislative rule.[24]

## III.

### CONCLUSION

In conclusion, while we are sympathetic to the equitable position and argument of the Hospital, it is well established that equitable arguments cannot overcome the discretion given to HCCRA to implement this statute.

---

**24.** The legislative rules were passed in 1992. The Legislature amended the 1985 version of W.

We are bound by the reasonable construction contained within 65 W. Va.C.S.R. 7, § 1, *et seq.* Therefore, we affirm the December 29, 1994, order of the Circuit Court of Kanawha County.

Affirmed.