758 S.E.2d 265

**KING COAL CHEVROLET COMPANY, Petitioner**

v.

**GENERAL MOTORS LLC, Respondent.**

No. 13–0675.

Supreme Court of Appeals of West Virginia.

Submitted March 25, 2014.

Decided April 24, 2014.

Christopher J. Sears, Esq., William R. Slicer, Esq., Shuman McCuskey & Slicer, Charleston, WV, Warren R. McGraw, II, Esq., McGraw Law Offices, Prosperity, WV, for Petitioner.

Jeffrey A. Kimble, Esq., E. Ryan Kennedy, Esq., Robinson & McElwee PLLC, Clarksburg, WV, Jeffrey J. Jones, Pro Hac Vice, Jones Day, Columbus, OH, for Respondent.

Thomas R. Goodwin, Esq., Johnny M. Knisely, II, Esq., Goodwin & Goodwin, LLP, Charleston, West Virginia, for Amicus Curiae The Alliance of Automobile Manufacturers.

Justice KETCHUM:

The United States District Court for the Southern District of West Virginia has submitted a certified question to this Court arising from a dispute between an automobile manufacturer, General Motors LLC ("General Motors"), and an automobile dealer, King Coal Chevrolet Company ("King Coal"). The issue before us is whether General Motors was required by W.Va.Code § 17A–6A–12(2) [2007] to provide King Coal with notice prior to entering into a new dealership agreement with another automobile dealer in King Coal's "relevant market area." The certified question submitted by the District Court is as follows:

> Do the circumstances in this case permit GM [General Motors] to avail itself of the safe harbor found in West Virginia Code section 17A–6A–12(4) or, instead, is it required to provide to King Coal the statutory notice commanded by section 17A–6A–12(2).

After thorough review, we find that General Motors may avail itself of the safe harbor contained in W.Va.Code § 17A–6A–12(4).[1]

1. In this Opinion, we refer to subsection (4) of the statute as "W.Va.Code § 17A–6A–12(4)" and as the "safe harbor provision."

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

King Coal is a motor vehicle dealer located in Oak Hill, West Virginia that sells Chevrolet motor vehicles. Chevrolet vehicles are manufactured by General Motors. Prior to 2010, Lewis Chevrolet Oldsmobile Cadillac ("Lewis Automotive" or "Lewis") operated a Chevrolet dealership in nearby Beckley, West Virginia. Lewis Automotive sold Chevrolet vehicles in Beckley for approximately eighty years. These two competing Chevrolet dealerships, King Coal and Lewis Automotive, were located twelve miles apart and co-existed in the marketplace for approximately thirty-five years.[2]

On June 1, 2009, General Motors Corporation[3] filed for bankruptcy and proposed a restructuring of its dealer network. General Motors described the restructuring process as follows:

GMCorp offered some poorly performing dealers "Wind–Down Agreements," under which GM would make payments to the dealers and they would agree to cease operations on or before October 31, 2010. Under the dealer network plan, GM planned to consolidate some dealers and replace other poorly performing dealers with new owners in critical markets to continue the same Chevrolet dealership op-

erations. As a result of Lewis's history of poor performance, GMCorp offered Lewis a Wind–Down Agreement on June 1, 2009, which Lewis executed.

Pursuant to this "Wind–Down Agreement," Lewis Automotive accepted a "substantial monetary payment" from General Motors in exchange for closing its Chevrolet operations. Lewis Automotive actually closed its Chevrolet operations on October 31, 2010. However, Lewis Automotive continued selling motor vehicles from manufacturers other than General Motors.

General Motors subsequently sought proposals to operate a Chevrolet dealership in Beckley, West Virginia, from candidates other than Lewis Automotive.[4] On April 8, 2011, General Motors chose the proposal submitted by "Crossroads Chevrolet."[5] Crossroads signed its dealership agreement with General Motors on September 20, 2012, and has operated its Chevrolet dealership at the Beckley location since that date.[6]

Crossroads Chevrolet is located approximately 2.6 air miles from the former Beckley Chevrolet dealership, Lewis Automotive. Further, Crossroads is located approximately 10.3 air miles from King Coal. It is undisputed that Crossroads Chevrolet is located within the twenty mile "relevant market area" of King Coal as defined in W.Va.Code § 17A–6A–3(14).[7]

---

2. The parties stipulated the following to the District Court: "Before Lewis ceased operations on or before October 31, 2010, King Coal and Lewis both operated Chevrolet dealerships in the Beckley area for at least 35 years."

3. According to King Coal, "General Motors Corporation ("Old GM") filed for Chapter 11 reorganization in the United States Bankruptcy Court for the Southern District of New York. Pursuant to Section 363 of the United States Bankruptcy Code, Old GM reorganized itself as General Motors, LLC[.]"

4. General Motors states that it received "proposals from several potential candidates to continue Chevrolet operations in the Beckley market, including the current owners of King Coal." Further, General Motors states that the current owners of King Coal acquired the King Coal dealership pursuant to an agreement entered into on May 21, 2012. Thus, according to General Motors, the current owners of King Coal acquired the King Coal dealership with full knowledge that General Motors planned to re-

place Lewis Automotive with a new Chevrolet dealer in Beckley, West Virginia.

5. The "Crossroads" proposal was submitted to General Motors by Mid–State Automotive Incorporated.

6. General Motors states that Crossroads Chevrolet has invested $8,000,000.00 into the dealership and has fifty employees.

7. W.Va.Code § 17A–6A–3(14) states:

(14) "Relevant market area" means the area located within a twenty air-mile radius around an existing same line-make new motor vehicle dealership: Provided, That a fifteen mile relevant market area as it existed prior to the effective date of this statute shall apply to any proposed new motor vehicle dealership as to which a manufacturer or distributor and the proposed new motor vehicle dealer have executed on or before the effective date of this statute a written agreement, including a letter

King Coal sent a letter to General Motors on September 10, 2012, demanding that General Motors provide it with written notice, required by W.Va.Code § 17A–6A–12(2), of General Motors' intent to "establish an additional dealer" so that King Coal could exercise its statutory rights and protect its interests under the *West Virginia Motor Vehicle Dealers, Distributors, Wholesalers and Manufacturers Act* ("*Motor Vehicle Dealers Act*" or the "*Act*"), W.Va.Code § 17A–6A–1 *et seq.* Once an existing dealer receives this statutory notice, it may file a declaratory judgment action to determine whether "good cause" exists for the opening of a new motor vehicle dealer of the same line-make within its relevant market area.[8] General Motors replied to King Coal on September 14, 2012, asserting that it was exempt from providing notice to King Coal by the safe harbor provision contained in W.Va.Code § 17A–6A–12(4), because it was "re-establishing" a new motor vehicle dealership that had closed within the preceding two years.

King Coal filed a petition for injunctive relief[9] against General Motors in the Circuit Court of Fayette County on September 26, 2012. General Motors removed the case to the United States District Court for the Southern District of West Virginia. On December 12, 2012, the District Court held a hearing to consider two motions: (1) King Coal's motion for a preliminary injunction, and (2) General Motors' motion to dismiss King Coal's complaint for injunctive relief.

In a memorandum opinion and order entered on May 23, 2013, the District Court denied both motions without prejudice and certified a question of law to this Court. Thereafter, this Court accepted the certified question.

## II.

## STANDARD OF REVIEW

When this Court is called upon to resolve a certified question, we employ a plenary review. "A de novo standard is applied by this Court in addressing the legal issues presented by a certified question from a federal district or appellate court." Syllabus Point 1, *Light v. Allstate Ins. Co.*, 203 W.Va. 27, 506 S.E.2d 64 (1998); *accord* Syllabus Point 1, *Bower v. Westinghouse Elec. Corp.*, 206 W.Va. 133, 522 S.E.2d 424 (1999) ("This Court undertakes plenary review of legal issues presented by certified question from a federal district or appellate court."). With this standard in mind, we proceed to examine the parties' arguments.

## III.

## ANALYSIS

This certified question requires us to analyze the *Motor Vehicle Dealers Act*, W.Va.Code § 17A–6A–1 *et seq.* The purpose of the *Motor Vehicle Dealers Act* is set forth in W.Va.Code § 17A–6A–1. It states:

The legislature finds and declares that the distribution and sale of motor vehicles

of intent, performance agreement or commitment letter, concerning the establishment of the proposed new motor vehicle dealership.

8. W.Va.Code § 17A–6A–12(3) states:

Within sixty days after receiving the notice provided in subsection (2) of this section, or within sixty days after the end of any appeal procedure provided by the manufacturer or distributor, a new motor vehicle dealer of the same line-make within the affected relevant market area may bring a declaratory judgment action in the circuit court for the county in which the new motor vehicle dealer is located to determine whether good cause exists for the establishing or relocating of the proposed new motor vehicle dealer: Provided, That a new motor vehicle dealer of the same line-make within the affected relevant market area shall not be permitted to bring such an action if the proposed relocation site would be further from

the location of the new motor vehicle dealer of the same line-make than the location from which the dealership is being moved. Once an action has been filed, the manufacturer or distributor may not establish or relocate the proposed new motor vehicle dealer until the circuit court has rendered a decision on the matter. An action brought pursuant to this section shall be given precedence over all other civil matters on the court's docket. The manufacturer has the burden of proving that good cause exists for establishing or relocating a proposed new motor vehicle dealer.

9. King Coal's petition for injunctive relief sought an order (1) enjoining General Motors from permitting the operation of any Chevrolet dealership within the relevant market area of King Coal; and (2) compelling General Motors to provide King Coal with statutory notice pursuant to the *Motor Vehicle Dealers Act.*

in this State vitally affects the general economy and the public welfare and that in order to promote the public welfare and in the exercise of its police power, it is necessary to regulate motor vehicle dealers, manufacturers, distributors, and representatives of vehicle manufacturers and distributors doing business in this State in order to avoid undue control of the independent new motor vehicle dealer by the vehicle manufacturer or distributor and to ensure that dealers fulfill their obligations under their franchises and provide adequate and sufficient service to consumers generally.

The certified question submitted by the District Court is as follows:

Do the circumstances in this case permit GM [General Motors] to avail itself of the safe harbor found in West Virginia Code section 17A–6A–12(4) or, instead, is it required to provide to King Coal the statutory notice commanded by section 17A–6A–12(2).

Accordingly, we must examine the notice requirements contained in W.Va.Code § 17A–6A–12(2) and the safe harbor provision contained in W.Va.Code § 17A–6A–12(4).

King Coal argues that under the plain language of W.Va.Code § 17A–6A–12(2), General Motors was required to provide it with statutory notice prior to entering into a dealer agreement with Crossroads Chevrolet. W.Va.Code § 17A–6A–12(2) states:

Before a manufacturer or distributor enters into a dealer agreement establishing or relocating a new motor vehicle dealer within a relevant market area where the same line-make is represented, the manufacturer or distributor shall give written notice to each new motor vehicle dealer of the same line-make in the relevant market area of its intention to establish an additional dealer or to relocate an existing dealer within that relevant market area.

King Coal states that Crossroads Chevrolet is an "additional dealer" located within its relevant market area. Therefore, King Coal asserts that General Motors was required to provide it with notice prior to entering into a dealer agreement with Crossroads.

By contrast, General Motors argues that it was exempt from providing notice to King Coal because it met the criteria set forth in the safe harbor provision of the *Motor Vehicle Dealers Act*, W.Va.Code § 17A–6A–12(4), which states:

This section does not apply to the reopening in a relevant market area of a new motor vehicle dealer that has been closed or sold within the preceding two years if the established place of business of the new motor vehicle dealer is within four miles of the established place of business of the closed or sold new motor vehicle dealer.

General Motors states that Crossroads Chevrolet is a "reopening" of its Beckley Chevrolet operations. Because this reopening occurred within two years of Lewis Automotive closing its Chevrolet operations, and because Crossroads is located within four miles of the previous Chevrolet dealer (Lewis), General Motors asserts that it satisfied the temporal and geographic requirements set forth in the safe harbor provision.

The resolution of this issue begins with a review of our rules of statutory construction. This Court has held that in deciding the meaning of a statutory provision, "[w]e look first to the statute's language. If the text, given its plain meaning, answers the interpretive question, the language must prevail and further inquiry is foreclosed." *Appalachian Power Co. v. State Tax Dep't of West Virginia*, 195 W.Va. 573, 587, 466 S.E.2d 424, 438 (1995); *see also* Syllabus Point 2, *Crockett v. Andrews*, 153 W.Va. 714, 172 S.E.2d 384 (1970) ("Where the language of a statute is free from ambiguity, its plain meaning is to be accepted and applied without resort to interpretation."); and Syllabus Point 2, *State v. Epperly*, 135 W.Va. 877, 65 S.E.2d 488 (1951) ("A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect.").

Additionally, this Court has held that "[a] statute is open to construction only where the language used requires interpretation because of ambiguity which renders it susceptible of two or more constructions or of such

doubtful or obscure meaning that reasonable minds might be uncertain or disagree as to its meaning." *Sizemore v. State Farm Gen. Ins. Co.,* 202 W.Va. 591, 596, 505 S.E.2d 654, 659 (1998) (internal quotations and citation omitted). With these rules of statutory construction in mind, we turn to W.Va.Code § 17A–6A–12(4).

▇▇▇ The present dispute centers around the parties' conflicting interpretations of the word "reopening" contained in W.Va.Code § 17A–6A–12(4). As this Court recognized in *West Virginia Health Care Cost Review Authority v. Boone Memorial Hosp.,* 196 W.Va. 326, 472 S.E.2d 411 (1996), "[i]t is a fundamental principle of statutory construction that the meaning of a word cannot be determined in isolation, but it must be drawn from the context in which it is used." *Id.* at 338, 472 S.E.2d at 423. "Often, 'the meaning of a word that appears ambiguous if viewed in isolation [will] become clear when the word is analyzed in light of the terms that surround it.'" *Id.* (quoting *Smith v. United States,* 508 U.S. 223, 229, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993)).

King Coal argues that Crossroads is not a "reopening" of the Lewis Chevrolet dealership. Rather, Crossroads Chevrolet is a new motor vehicle dealer that has no association with Lewis Automotive. King Coal argues that there must be an association between the previous dealer (Lewis) and the dealer (Crossroads Chevrolet) "reopening" the line-make for purposes of invoking the safe harbor provision. King Coal states that there is no association in this case because Lewis Automotive has not closed, it simply ceased its Chevrolet operations. King Coal asserts that because Lewis Automotive has not closed, it cannot be "reopened" and General Motors, therefore, cannot satisfy the safe harbor requirements contained in W.Va.Code § 17A–6A–12(4).

Conversely, General Motors argues that the word "reopening" in the safe harbor provision refers to the reopening of a particular line-make, i.e. Chevrolet, rather than a reopening of the actual dealer that "has been closed or sold." General Motors states that

because it reopened the Chevrolet line-make in Beckley within the temporal (two years) and geographic (within four miles of Lewis Automotive) requirements set forth in W.Va. Code § 17A–6A–12(4), it may avail itself of the safe harbor provision.

Further, General Motors asserts that the phrase "has been closed" contained in W.Va. Code § 17A–6A–12(4) supports its contention that the safe harbor provision does not require an association between the previous dealer and the dealer reopening the line-make. General Motors states that there is no reason that a dealer that "has been closed," whether it be for poor performance or for a violation of a dealership obligation, would be expected to have any association with the subsequent dealer that is appointed to reopen and replace that dealer. Therefore, General Motors argues that King Coal's position that the safe harbor provision requires an association between the previous dealer and the dealer "reopening" the line-make is misplaced and not supported by the plain language of the statute.

We agree with General Motors and find that its interpretation of W.Va.Code § 17A–6A–12(4) is consistent with the plain language of the statute, and with the general purpose of W.Va.Code § 17A–6A–12. The plain language of the safe harbor provision does not require an association between the dealer that has been closed or sold and the dealer "reopening" the line-make. Had the Legislature intended that W.Va.Code § 17A–6A–12(4) only apply when such an association was present, it could have explicitly stated this requirement in the statute.

Further, the reference to a dealership that "has been closed" in the safe harbor provision demonstrates the Legislature's recognition that there are circumstances, distinct from the sale of a dealership, which will result in the closing of a dealership. The *Motor Vehicle Dealers Act* provides circumstances, including criminal conduct, fraudulent conduct, the revocation of a license, and bankruptcy, in which a manufacturer can lawfully close a dealer on an expedited basis. *See* W.Va.Code § 17A–6A–7(c).[10] The *Act*

---

**10.** W.Va.Code § 17A–6A–7(c) states:

(c) Notwithstanding subdivision (a) of this sub-

allows a manufacturer to replace a terminated dealer after the termination takes effect. *See* W.Va.Code § 17A–6A–7(f).[11] Considering the language of W.Va.Code § 17A–6A–7 in conjunction with the "has been closed" language in W.Va.Code § 17A–6A–12(4), the *Motor Vehicle Dealers Act* clearly contemplates a scenario in which a dealer will be closed and a manufacturer will need to replace that dealer to reopen its line-make in a particular marketplace. The safe harbor provision allows a manufacturer to "reopen" a line-make with a new dealer if it meets the temporal (within two years of the previous dealer closing) and geographic (within four miles of the previous dealer's location) requirements set forth in the statute. It would not make sense for the Legislature to require privity between a dealer whose dealer agreement was terminated for criminal activity, fraudulent conduct or bankruptcy, and the subsequent dealer reopening the line-make.

Additionally, General Motors' argument that the safe harbor provision does not require an association between the previous dealer and the dealer "reopening" a manufacturer's line-make is supported by W.Va.Code § 17A–6A–12(1). This statute addresses the notice requirements when there is an association between a closed dealer and its buyer or transferee. W.Va.Code § 17A–6A–12(1) states:

> As used in this section, "relocate" and "relocation" do not include the relocation of a new motor vehicle dealer within four

miles of its established place of business or an existing new motor vehicle dealer *sells or transfers the dealership to a new owner* and the successor new motor vehicle dealership owner relocates to a location within four miles of the seller's last open new motor vehicle dealership location. The relocation of a new motor vehicle dealer to a site within the area of sales responsibility assigned to that dealer by the manufacturing branch or distributor may not be within six air miles of another dealer of the same line-make.

*Id.* (emphasis added). King Coal's argument that the safe harbor provision, W.Va.Code § 17A–6A–12(4), requires an association between a closed dealer and the dealer reopening the line-make effectively conflates W.Va. Code § 17A–6A–12(1) with the safe harbor provision. General Motors argues that the safe harbor provision is applicable to a broader set of circumstances, including those where a dealer "has been closed," than those covered under W.Va.Code § 17A–6A–12(1). We agree.

 Had the Legislature intended the notice requirement to apply only when there was an association between a closed dealer and the dealer reopening the line-make, which is addressed by W.Va.Code § 17A–6A–12(1), the safe harbor provision would be duplicative and unnecessary. We presume that the Legislature did not intend the safe harbor provision and W.Va.Code § 17A–6A–

---

section, notice shall be made not less than thirty days prior to the effective date of the termination, cancellation, nonrenewal or discontinuance for any of the following reasons:
(1) Insolvency of the new motor vehicle dealer or the filing of any petition by or against the new motor vehicle dealer under any bankruptcy or receivership law;
(2) Failure of the new motor vehicle dealer to conduct his or her customary sales and service operations during his or her customary business hours for seven consecutive business days;
(3) Conviction of the new motor vehicle dealer or its principal owners of a crime, but only if the crime is punishable by imprisonment in excess of one year under the law under which the dealer was convicted or the crime involved theft, dishonesty or false statement regardless of the punishment;
(4) Revocation of a motor vehicle dealership license in accordance with section eighteen, article six of this chapter; or

(5) A fraudulent misrepresentation by the new motor vehicle dealer to the manufacturer or distributor, which is material to the dealer agreement.

11. W.Va.Code § 17A–6A–7(f) states:

No replacement dealer shall be named for this point or location to engage in business and the dealer's agreement shall remain in effect until a final judgment is entered after all appeals are exhausted: *Provided,* That when a motor vehicle dealer appeals a decision upholding a discontinuation, cancellation or nonrenewal under subdivisions (f) and (g) of this section, the dealer agreement shall remain in effect pending exhaustion of all appeals only if the motor vehicle dealer establishes a likelihood of success on appeal and that the public interest will not be harmed by keeping the dealer agreement in effect pending entry of final judgment after such appeal.

12(1) to have identical meanings. "A cardinal rule of statutory construction is that significance and effect must, if possible, be given to every section, clause, word or part of the statute." Syllabus Point 3, *Meadows v. Wal–Mart Stores, Inc.*, 207 W.Va. 203, 530 S.E.2d 676 (1999). It is presumed that each word in a statute has a definite meaning and purpose. *State ex rel. Johnson v. Robinson*, 162 W.Va. 579, 582, 251 S.E.2d 505, 508 (1979). "It is always presumed that the legislature will not enact a meaningless or useless statute." Syllabus Point 3, *United Steelworkers of America, AFL–CIO, CLC v. Tri-State Greyhound Park*, 178 W.Va. 729, 364 S.E.2d 257 (1987) (citing Syllabus Point 4, *State ex rel. Hardesty v. Aracoma–Chief Logan No. 4523, V.F.W.*, 147 W.Va. 645, 129 S.E.2d 921 (1963)). Courts should favor the plain and obvious meaning of a statute as opposed to a narrow or strained construction. *Thompson v. Chesapeake & O. Ry. Co.*, 76 F.Supp. 304, 307–308 (S.D.W.Va.1948).

Based on the foregoing, we find that General Motors' suggested interpretation—that the safe harbor provision is broader than W.Va.Code § 17A–6A–12(1) and includes the circumstance in which there is no association between a dealer that "has been closed" and the dealer that reopens a line-make—is supported by the plain language of the statute.

We also find that General Motors' suggested interpretation of W.Va.Code § 17A–6A–12(4) is consistent with the general purpose of W.Va.Code § 17A–6A–12. W.Va.Code § 17A–6A–12 requires an automobile manufacturer to provide notice to an existing dealer when an "additional dealer" is added to the existing dealer's "relevant market area." The Legislature used the phrase "additional dealer" three times in W.Va.Code § 17A–6A–12, including in the title of the statute which states: "Establishment and relocation or establishment of *additional dealers*." (Emphasis added). The phrase "additional dealer" is also used in W.Va.Code § 17A–6A–12(2) and W.Va.Code § 17A–6A–12(5).[12] This Court examined W.Va.Code § 17A–6A–12(2) in *Raines Imports, Inc. v. American Honda*

*Motor Co., Inc.*, 223 W.Va. 303, 674 S.E.2d 9 (2009), and held in Syllabus Point 5 that:

> The plain language of W.Va.Code § 17A–6A–12(2) (2000) (Repl.Vol.2004) requires statutory notice before a manufacturer or distributor enters into a dealer agreement to establish an *additional new dealer* or relocate an existing motor vehicle dealer of the same line-make within a preexisting dealer's "relevant market area," as that term is defined by W.Va. Code § 17A–6A–3 (2000) (Repl.Vol.2004).

(Emphasis added).

General Motors argues that because the statute was designed to address the entry of an "additional dealer" into the marketplace, the safe harbor provision should be considered in *pari materia* with this purpose. General Motors states that a manufacturer that reopens a line-make within the temporal and geographic requirements contained in the safe harbor provision is not adding an "additional dealer" to the marketplace. Rather, a manufacturer that complies with the reopening requirements in the safe harbor provision is maintaining the status quo of the marketplace. We agree.

The Lewis Automotive and King Coal dealerships both sold Chevrolets in the Oak Hill/Beckley area for thirty-five years prior to Lewis closing its Chevrolet operations in 2010. After Lewis closed its Chevrolet operations, General Motors reopened the Chevrolet line-make in Beckley within the two-year window set forth in the safe harbor provision. By reopening its Chevrolet line-make within the temporal and geographic requirements contained in the safe harbor provision, General Motors was not adding an "additional dealer" to the marketplace; instead, it was maintaining the status quo that had existed in the Oak Hill/Beckley area for the previous thirty-five years. Stated another way, there were two Chevrolet dealers in the Oak Hill/Beckley marketplace from 1975–2010 and there have been two Chevrolet dealerships in the marketplace from 2012–present. Because General Motors replaced its Chevrolet dealership within the two-year time frame

---

**12.** W.Va.Code § 17A–6A–12(5) states: "In determining whether good cause exists for establishing or relocating an additional new motor vehicle dealer for the same line-make, the court shall take into consideration … the following[.]"

set forth in W.Va.Code § 17A–6A–12(4), Crossroads Chevrolet cannot be properly characterized as an "additional dealer."

Based on all of the foregoing, we hold that W.Va.Code § 17A–6A–12(2) of the *Motor Vehicle Dealers Act* requires an automobile manufacturer to provide notice to its existing motor vehicle dealers when adding an "additional dealer" that sells motor vehicles of the same line-make, e.g. Chevrolet, to the existing dealer's relevant market area. The *Motor Vehicle Dealers Act* contains a safe harbor provision, W.Va.Code § 17A–6A–12(4), providing that the notice mandated by W.Va. Code § 17A–6A–12(2) is not required when a motor vehicle dealer has been closed or sold and the manufacturer reopens its line-make through a new motor vehicle dealer if the following conditions are met: (1) the new motor vehicle dealer is opened within two years of the previous dealer being closed or sold, and (2) the new motor vehicle dealer is located within four miles of the previous dealer. When an existing motor vehicle dealer closes its operations of a line-make, e.g. Chevrolet, and the manufacturer later reopens the line-make by entering into a dealer agreement with a new motor vehicle dealer within the temporal and geographic requirements set forth in W.Va.Code § 17A–6A–12(4), the manufacturer may avail itself of the safe harbor protection contained in W.Va. Code § 17A–6A–12(4) of the *Motor Vehicle Dealers Act*.

## IV.

### CONCLUSION

Because General Motors reopened its Chevrolet line-make within the temporal and geographic requirements set forth in W.Va.Code § 17A–6A–12(4) after Lewis Automotive closed its Chevrolet operations, we answer the certified question—"[d]o the circumstances in this case permit [General Motors] to avail itself of the safe harbor found in West Virginia Code section 17A–6A–12(4)"—in the affirmative.

Certified Question Answered.