481 S.E.2d 764

**STATE of West Virginia ex rel. EAST END ASSOCIATION, J. Michael Mollohan and Carter Zerbe, Petitioners**

**v.**

**Eli McCOY, Director of the Department of Environmental Protection; Gretchen Lewis, Secretary, Department of Health and Human Resources; and Charleston Area Medical Center, Inc., Respondents.**

No. 23746.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 29, 1996.

Decided Dec. 16, 1996.

Joshua I. Barrett, Sean P. McGinley, Di-Trapano & Jackson, Charleston, Patrick C. McGinley, Morgantown, for Petitioners.

William E. Adams, Jr., Charleston, for Respondent, Department of Environmental Protection.

Darrell V. McGraw, Jr., Attorney General, Charlene A. Vaughan, Senior Assistant Attorney General, Jeffrey K. Matherly, Charleston, for Respondent, Department of Health and Human Resources.

James R. Snyder, Barbara D. Little, Jackson & Kelly, Charleston, for Respondent, Charleston Area Medical Center, Inc.

McHUGH, Chief Justice:

Petitioners East End Association, an unincorporated association, J. Michael Mollohan and Carter Zerbe invoke this Court's[1] original jurisdiction pursuant to *W. Va.Code,* 53–1–3 [1933], and request that a writ of mandamus be directed against respondents Eli McCoy, Director, Division of Environmental Protection (hereinafter collectively referred to as "DEP"), Gretchen Lewis, Secretary, Department of Health and Human Resources (hereinafter collectively referred to as "DHHR"), to compel them to perform their mandatory, nondiscretionary duties under, respectively, the West Virginia Solid Waste Management Act, *W. Va.Code,* 22–15–1 *et seq.,* and the West Virginia Medical Waste Act, *W.Va.Code,* 20–5J–1 *et seq.* with regard to the permit application process for respondent Charleston Area Medical Center, Inc.'s (hereinafter "CAMC") construction of a new medical waste incinerator. On October 3, 1996, this Court issued a rule in mandamus against respondents DEP and DHHR to show cause why a peremptory writ of mandamus should not be awarded against them.[2]

I.

The facts of this case are, for the most part, not in dispute. CAMC provides health care in Charleston, West Virginia, through three divisions, namely, the Women's and Children's Hospital, the Memorial Division, and the General Division. CAMC produces both noninfectious and infectious medical waste, such as blood and other body fluids, needles, laboratory and pathological wastes.

Until recently, CAMC operated medical waste incinerators at each of its three divisions. All three of these medical waste incinerators burned both infectious and noninfectious waste. Due to the advanced age of the three incinerators, as well as to newly-enacted state and federal regulatory standards, CAMC, with the help of two consulting firms, determined that its three incinerators should be replaced with a single, centralized incinerator.[3] This centralized, state-of-the-art medical waste incinerator is currently under construction where the incinerator at the General Division formerly stood, in the east end of Charleston.[4]

Following a proceeding in which some of the petitioners herein[5] were parties in opposition, CAMC obtained approval from the West Virginia Health Care Cost Review Au-

---

1. The Honorable Arthur M. Recht resigned as Justice of the West Virginia Supreme Court of Appeals effective October 15, 1996. The Honorable Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing October 15, 1996 and continuing until further order of this Court.

2. Petitioners also filed a motion for injunctive relief against CAMC, seeking to enjoin it from constructing and operating the incinerator at issue until it applies for and obtains the proper permits under both the Solid Waste Management Act and the Medical Waste Act. This Court granted petitioner's motion for injunctive relief only as to the *operation* of the incinerator at issue, thereby permitting CAMC to continue construction of the incinerator, which construction began in July, 1996.

   As will be discussed below, the Circuit Court of Kanawha County had previously denied petitioners' motion for injunctive relief by order of August 22, 1996.

3. The decision to replace its three incinerators with a single incinerator was made after CAMC studied the alternatives for managing its waste. The consulting firms hired by CAMC ultimately recommended that CAMC should continue to use incineration as the method of medical waste disposal.

4. The incinerator located at the Memorial Division is the only incinerator currently operating.

5. Petitioner East End Association, a neighborhood community organization of more than 300 members, exists to advance, protect and promote the quality of life of residents of the east end of Charleston. The majority of the association's members live within one and one-half miles of the incinerator. One-half of the area where the association's members reside is comprised of a designated "historical district." The association is also actively involved in promoting a $70 million arts and cultural center and a farmer's market, both of which are to be built close to the incinerator.

   Petitioners Mollohan and Zerbe reside approximately two blocks from the incinerator.

thority to commit funds for its new incinerator. CAMC subsequently demolished the incinerator at the General Division and eventually began construction there of the one presently at issue.

Prior to commencing construction, CAMC applied to the DEP's Office of Air Quality (hereinafter "DEP–OAQ") for a permit to construct the new incinerator, which is a stationary source of air pollutants, pursuant to *W.Va.Code*, 22–5–11 [1994][6] of the West Virginia Air Pollution Control Act. Application for this permit was the subject of two legal advertisements in local newspapers, advising the public of the permit application and soliciting public comment thereon. The DEP–OAQ, receiving neither public comment nor a request for a public meeting on the matter, issued to CAMC a permit[7] to construct the incinerator[8] on or about March 17, 1995.[9]

In late July of 1996, CAMC began constructing the new incinerator at the General Division. As of the date of the filing of this petition, construction of the new incinerator was scheduled to be completed in November of 1996.

On July 31, 1996, petitioners filed a complaint and motion for a temporary and permanent injunction in the Circuit Court of Kanawha County to enjoin CAMC from "undertaking any construction activity related to its proposed incinerator until such time as it has acquired all permits and approvals it is required by law to obtain before commencing such construction." Specifically, petitioners alleged, *inter alia*, that CAMC was required to, but did not apply for and receive permits under both the West Virginia Solid Waste Management Act, *W. Va.Code*, 22–15–1 *et seq.*, and the West Virginia Medical Waste Act, *W. Va.Code*, 20–5J–1 *et seq.*, prior to construction of the incinerator.

### A.

On August 9, 1996, four days before the scheduled hearing on petitioners' request for injunctive relief, CAMC filed an application for a solid waste *operation* permit,[10] under the West Virginia Solid Waste Management Act, pursuant to 47 C.S.R. 38–3.16.2.b.B [1996], which requires incinerator facilities to obtain "[a] solid waste permit for solid waste storage areas and support facilities from the [DEP]."[11]

6. *W. Va.Code*, 22–5–11 [1994] provides, in relevant part:

> No person shall construct, modify or relocate any stationary source of air pollutants without first obtaining a construction, modification or relocation permit as provided in this section.

7. According to the circuit court's August 22, 1996 order, revisions were subsequently made to this permit. However, because "these revisions did not affect emissions and, in fact, placed more stringent requirements on CAMC, DEP–OAQ, pursuant to its policies, did not publish a notice concerning them."

8. According to the aforementioned legal advertisement which gave the public notice of CAMC's permit application to the DEP–OAQ, CAMC had submitted an application for a permit to construct, as well as to operate, the new incinerator. *See W. Va.Code*, 22–5–12 [1994] ("No person may *operate* a stationary source of air pollutants without first obtaining an operating permit as provided in this section." *Id.*, in relevant part. (emphasis added)).

> This permit is not at issue in the case before us.

*W. Va.Code*, 22–5–13 [1994] allows for the consolidation of the construction permit and the operation permit. *See Id.* ("For permits required

by [*W. Va.Code*, 22–5–11 and 22–5–12], the director may incorporate the required permits with an existing permit or consolidate the required permits into a single permit.")

9. Pursuant to *W.Va.Code*, 22–5–14 [1994], "[a]ny person whose interest may be affected, including, but not necessarily limited to, the applicant and any person who participated in the public comment process, by a permit issued, modified or denied by the director may appeal such action of the director to the air quality board pursuant to [*W.Va.Code*, 22B–1–1 et seq.] [.]" No appeal of the DEP–OAQ's decision to issue a permit to CAMC was taken.

10. On October 17, 1996, the DEP published notice of this permit application, inviting public comment on the draft solid waste permit. A public hearing on the draft permit was scheduled for November 21, 1996.

11. A "solid waste facility" is defined as "any system, facility, land, contiguous land, improvements on the land, structures, or other appurtenances or methods used for processing, recycling, or disposing of solid waste including ... incinerators[.]" 47 C.S.R. 38–2.120 [1996], in relevant part. " 'Storage' or 'Storage Area' means the interim storage of solid waste, at a

On August 12, 1996, one day before the August 13, 1996 hearing on petitioners' motion, the DEP and CAMC entered into a consent order, pursuant to *W. Va.Code,* 22–15–5(f) [1994].[12] Under the consent order, CAMC is permitted to operate the new incinerator while its solid waste permit application is being considered.[13] According to its order denying petitioners' motion for injunctive relief, the circuit court found, *inter alia,* that "[t]he terms of the consent order are the same as those which will be in the permit if and when it is issued[,]" and that "[t]hese terms relate solely to operations and will not permit any construction." [14]

The circuit court further found that solid waste permits such as the one applied for by CAMC and currently being considered by the DEP have not been required of any other medical waste incinerator in this State. According to the circuit court's order, the DEP is currently evaluating this situation and it may enter into consent orders with other hospitals.

**B.**

In 1992, the DHHR began processing applications for permits to operate infectious medical waste management facilities under the West Virginia Medical Waste Act, *W. Va.Code,* 20–5J–1 *et seq.*[15] On. or about May 27, 1992, CAMC applied to the DHHR for a permit to operate its existing infectious medical waste management facility at the General Division under the Medical Waste Act. No public notice of this permit application was given.[16] On September 28, 1992, CAMC also submitted its required Infectious Medical Waste Management Plan, pursuant to 64 C.S.R. 56–5 [1993],[17] at which time it requested a waiver to certain incinerator operation requirements, as the incinerator at General Division, in existence when the Medical Waste Act was enacted, did not comply with these requirements.[18] The DHHR subse-

---

permitted solid waste facility on a temporary basis. Any storage that exceeds [180] days, without the prior written approval of the director [of the DEP], in such a manner, constitutes illegal disposal of such solid waste (i.e., staging areas)." 47 C.S.R. 38–2.125 [1996].

**12.** *W. Va.Code,* 22–15–5(f) [1994] *provides:*

In addition to all other powers, duties, responsibilities and authority granted and assigned to the director in this code and elsewhere described by law, the director is empowered as follows:

. . . .

(f) The director may also perform or require a person, by order, to perform any and all acts necessary to carry out the provisions of this article or the rules promulgated thereunder.

**13.** It was apparently anticipated that the new incinerator would be completed and ready for operation before completion of the permitting process.

**14.** According to the circuit court's order, the terms of the operation permit, if and when it is issued under the Solid Waste Management Act, would require such things as: (1) a plan for an alternate plan for waste disposal; (2) screening of waste; (3) confine wastes to designated storage areas; (4) dust control; (5) recordkeeping; (6) cleaning; and (7) ash testing.

**15.** When the Medical Waste Act became effective upon passage on February 23, 1991, CAMC's infectious medical waste management facility

·was already in operation and was previously under the regulation of the DEP–Office of Waste Management.

**16.** According to the DHHR, it likewise gave no public notice prior to issuing similar permits to approximately 175 other infectious medical waste management facilities.

**17.** *See* 64 C.S.R. 56–5.1 [1993] ("All infectious medical waste management facilities shall develop an infectious medical waste management plan." *Id.* in relevant part); 64 C.S.R. 56–4.4.4 [1993] (requiring, as part of permit application, "[a] proposed infectious medical waste management plan as required by Section 5 of this rule.").

**18.** Such a waiver is authorized under 64 C.S.R. 56–10.2.7 [1993], which provides:

Facilities with incinerators *in operation at the time this rule becomes effective* may apply to the secretary [of the DHHR] for a *waiver* to [64 C.S.R. 56–10.2.2 through 10.2.4] of this rule. The waiver, if granted, shall be in effect for a maximum of two (2) years after issuance of applicable final Environmental Protection Agency rules relating to medical waste incineration and *shall be contingent upon submission of plans to upgrade the facility so as to be in full compliance with [64 C.S.R. 56–10.2.2 through 10.2.4] of this rule.* The plans shall be submitted as part of the infectious medical waste facility management plan required in [64 C.S.R. 56–5] and shall be subject to approval by the secretary.

quently granted CAMC a waiver to the incinerator operation requirements "contingent upon submission of plans to *upgrade the facility* so as to be in full compliance with [64 C.S.R. 56–10.2.2 through 10.2.4][.]" 64 C.S.R. 56–10.2.7 [1993], in relevant part. (emphasis added).

CAMC has since applied for and received annual renewal permits to operate its infectious medical waste management facility at General Division.[19]

In conjunction with its renewal permit application for 1995–96 and submission of its Infectious Medical Waste Management Plan, Lillian D. Morris, Safety Director at CAMC, in a letter dated April 14, 1995, informed the DHHR, *inter alia*, that CAMC had been issued a permit by the DEP–OAQ to construct the incinerator at issue at the General Division. CAMC Safety Director Morris, referring to 64 C.S.R. 56–4.1 [1993], which provides that "no person may ... construct, modify ... an infectious medical waste management facility ... without first obtaining a permit[,]" *Id.*, in relevant part, asked that DHHR advise her as to its "specific requirements for application applicable to this project." In its August 22, 1996 order denying petitioners' motion for injunctive relief, the circuit court found that, in response to CAMC's inquiry, the "DHHR informed CAMC that all that would be required for the upgrade would be a[n] [Infectious Medical Waste Management] [P]lan revision to be approved prior to operation."

CAMC applied for renewal of its permit for 1996–97 by application dated April 25,

1996. This application indicated, on its face, that a new incinerator was being constructed at the General Division. CAMC submitted its Infectious Medical Waste Revised Management Plan, dated August 8, 1996, after construction of the incinerator at issue began in July of 1996.[20]

The DHHR accepted CAMC's revised plan, conveying in an August 15, 1996 letter to Safety Director Morris the following relevant information:

Receipt is acknowledged of your August 9, 1996, letter enclosing the revised Infectious Medical Waste Management Plans (IMWMP) for CAMC General Division.

Section 10 of your IMWMP includes upgrades to the incinerator pursuant to [64 C.S.R. 56–10.2.7] which will bring it into full compliance with [64 C.S.R. 56–10.2.2 through 10.2.4]. We note the replacement incinerator has been approved by the [DEP–OAQ] and a new Permit to Construct a Stationary Source of Air Pollutants was issued on July 30, 1996. The proposed unit will meet or exceed the anticipated EPA Medical Waste Incinerator Rules. It is also noted that the incinerator at General division will be used to treat the waste generated at all three CAMC divisions. Following upgrade and startup of this facility, and with the closing of the remaining incinerator at Memorial division, CAMC will no longer be operating under the waiver issued pursuant to [64 C.S.R. 56–10.2.7] in October of 1992.

Your IMWMP for CAMC General division has been reviewed and approved.

---

64 C.S.R. 56–10.2.2 through 10.2.4 [1993] generally concern certain temperature, control device and monitoring and recording requirements for infectious medical waste incinerators.

19. *See* 64 C.S.R. 56–4.9 [1993] ("Permits shall be renewed annually prior to expiration. An application for permit renewal shall be submitted forty-five (45) days prior to the expiration date of the previous permit.")

20. This revised plan indicated, *inter alia:*

**This plan reflects changes that will be made to the CAMC–General Division infectious medical waste management plan when the centralized incinerator currently under construction is operational (anticipated November, 1996).** (Bold provided).

Section 10.1 of the revised plan stated, *inter alia:*
Pursuant to [64 C.S.R. 56–10.2.7], CAMC plans to upgrade its facility by replacing the incinerator at its General Division with a unit which will be in full compliance with each requirement of [64 C.S.R. 56–10.2.2 through 10.2.4] ... for which a waiver was requested in 1992. *See* n. 18, *supra.*
Finally, section 10.2.7 of the revised plan provided:
Upon approval of this plan and commencement of the operation of the replacement incinerator, CAMC withdraws its request for a waiver of [64 C.S.R. 56–10.2.2 through 10.2.4] of the Infectious Waste Management rules requested in 1992 as the current incinerator meets and exceeds current requirements.

As indicated above, petitioners herein filed a motion for a temporary and permanent injunction against CAMC in the Circuit Court of Kanawha County on July 31, 1996. Petitioners sought to enjoin CAMC from constructing the incinerator at issue until it has, *inter alia*, obtained permits to construct under the West Virginia Solid Waste Management Act and the West Virginia Medical Waste Act. A hearing on petitioners' motion was conducted on August 13, 1996. In an order dated August 22, 1996, the circuit court denied petitioners' motion for injunctive relief.

Petitioners subsequently filed with this Court a petition for writ of mandamus against respondents DEP and DHHR to require these agencies to comply with their mandatory, nondiscretionary duties to require construction permits for incinerators such as the one at issue. Petitioners' petition further asked this Court to require the DHHR to promulgate regulations affording the right of public participation in the permit application process under the Medical Waste Act. Petitioners also filed a motion for injunctive relief against respondent CAMC, seeking to enjoin it from constructing and operating the incinerator at issue until it applies for and obtains the proper permits under both the Solid Waste Management Act and the Medical Waste Act. This Court granted the petitioners' motion for injunctive relief only as to *operation* of the incinerator. See n. 2, *supra.*

## II.

■ Entitlement to the extraordinary remedy of mandamus requires three fundamental elements:

" 'Before this Court may properly issue a writ of mandamus three elements must coexist: (1) the existence of a clear right in the petitioner to the relief sought; (2) the existence of a legal duty on the part of the respondent to do the thing the petitioner seeks to compel; (3) the absence of another adequate remedy at law." Syllabus Point 3, *Cooper v. Gwinn,* 171 W.Va. 245, 298 S.E.2d 781 (1981).' Syl. pt. 1, *Meadows v. Lewis,* 172 W.Va. 457, 307 S.E.2d 625 (1983).

Syl. pt. 2, *State ex rel. Blankenship v. Richardson,* 196 W.Va. 726, 474 S.E.2d 906 (1996).

## III.

### *The West Virginia Solid Waste Management Act*

In an effort to "establish a comprehensive program of controlling all phases of solid waste management[,]" *W. Va.Code,* 22–15–1(a) [1994], the legislature enacted the West Virginia Solid Waste Management Act, *W. Va.Code,* 22–15–1 *et seq.* In particular, the Solid Waste Management Act was enacted because

(b) [t]he Legislature finds that uncontrolled, inadequately controlled and improper collection, transportation, processing and disposal of solid waste (1) is a public nuisance and a clear and present danger to people; (2) provides harborages and breeding places for disease-carrying, injurious insects, rodents and other pests harmful to the public health, safety and welfare; (3) constitutes a danger to livestock and domestic animals; (4) decreases the value of private and public property, causes pollution, blight and deterioration of the natural beauty and resources of the state and has adverse economic and social effects on the state and its citizens; (5) results in the squandering of valuable nonrenewable and nonreplenishable resources contained in solid waste; (6) that resource recovery and recycling reduces the need for landfills and extends their life; and that (7) proper disposal, resource recovery or recycling of solid waste is for the general welfare of the citizens of this state.

(c) The Legislature further finds that disposal in West Virginia of solid waste from unknown origins threatens the environment and the public health, safety and welfare, and therefore, it is in the interest of the public to identify the type, amount and origin of solid waste accepted for disposal at West Virginia solid waste facilities.

. . . .

(f) The Legislature further finds that incineration technologies present potential-

ly significant health and environmental problems.

*Id.,* in relevant part.

▮ As indicated earlier, a "solid waste facility" is defined as "any system, facility, land, contiguous land, improvements on the land, structures, or other appurtenances or methods used for processing, recycling, or disposing of solid waste including ... incinerators[.]" 47 C.S.R. 38–2.120 [1996]. Solid waste includes noninfectious medical waste. *W. Va.Code,* 20–5J–3(8) [1991]. The incinerator at issue, including the area around it where solid waste is stored and handled prior to incineration, is considered a solid waste facility and is, therefore, governed by the Solid Waste Management Act.

### A.

Petitioners contend that CAMC was required to obtain a permit to construct the solid waste facility at issue, pursuant to the West Virginia Solid Waste Management Act, and, in particular, *W. Va.Code,* 22–15–10(b) [1994]. *W. Va.Code,* 22–15–10(b) [1994] provides:

It is unlawful for any person, *unless the person holds a valid permit from the [DEP]* to install, establish, *construct,* modify, operate or abandon *any solid waste facility. All approved solid waste facilities shall be* installed, established, *constructed,* modified, operated or abandoned *in accordance with this article,* plans, specifications, orders, instructions *and rules in effect.*

(emphasis added).

Similarly, *W. Va.Code,* 22–15–5(b) [1994], provides, in relevant part:

[t]he director [of the DEP], after public notice and opportunity for public hearing near the affected community, may issue a permit with reasonable terms and conditions for installation, establishment, modification, operation or closure of a solid waste facility: Provided, That the director may deny the issuance of a permit on the basis of information in the application or from other sources including public comment, if the solid waste facility is likely to cause adverse impacts on the environment.

*See* 47 C.S.R. 38–3.5.1 [1996] ("[a] permit must be obtained from the director [of the DEP] prior to the installation, establishment, construction, modification, operation, or closure of any solid waste facility.")

CAMC and the DEP argue, however, that *W. Va.Code,* 22–15–10(b) [1994] simply requires that a single permit be issued by the director of the DEP for the construction of a solid waste facility. CAMC and the DEP maintain that this directive was followed when, in March of 1995, the DEP, after public notice was given, issued a construction permit pursuant to the Air Pollution Control Act, *W. Va.Code,* 22–5–1 *et seq.*

Though petitioners do not presently challenge the validity of the construction permit issued by the DEP–OAQ pursuant to *W. Va.Code,* 22–5–11 [1994], they contend that the issuance of that construction permit does not satisfy the construction permit requirement of the Solid Waste Management Act. As petitioners point out, when the DEP–OAQ considered CAMC's permit application under the Air Pollution Control Act, *W. Va.Code,* 22–5–1, *et seq.,* it did not then consider the application in terms of the requirements of the Solid Waste Management Act and its corresponding regulations.

Petitioners' argument that CAMC was required to obtain a solid waste construction permit under *W. Va.Code,* 22–15–10(b) [1994], in addition to the permit it had already acquired under *W. Va.Code,* 22–5–11 [1994] of the Air Pollution Control Act, is not unreasonable. However, as indicated above, the DEP, which administers both the Solid Waste Management Act and the Air Pollution Control Act, interprets *W. Va.Code,* 22–15–10(b) [1994] as requiring that a single permit be issued by that agency for construction of a solid waste facility. According to the DEP, the construction permit required and, in fact, obtained by CAMC was the permit issued by the DEP–OAQ, pursuant to the Air Pollution Control Act.

▮ We defer to the DEP's interpretation of *W.Va.Code,* 22–15–10(b) [1994]. As we held in syllabus point 7 of *Lincoln County Board of Education v. Adkins,* 188 W.Va. 430, 424 S.E.2d 775 (1992): "'Interpretations of statutes by bodies charged with their ad-

ministration are given great weight unless clearly erroneous.' Syl. pt. 4, *Security National Bank & Trust Company v. First W. Va. Bancorp, Inc.*, 166 W.Va. 775, 277 S.E.2d 613 (1981)." Syllabus point 3, *Smith v. Board of Education of County of Logan*, 176 W.Va. 65, 341 S.E.2d 685 (1985).[21]

We hold, therefore, that under *W.Va.Code*, 22–15–10(b) [1994], it is unlawful for any person, unless the person holds a valid permit from the division of environmental protection to install, establish, construct, modify, operate or abandon any solid waste facility. All approved solid waste facilities shall be installed, established, constructed, modified, operated or abandoned in accordance with this article, plans, specifications, orders, instructions and rules in effect. A person who obtains a construction permit from the DEP under *W. Va.Code*, 22–5–11 [1994] of the West Virginia Air Pollution Control Act to construct a medical waste incinerator is not required to also obtain a construction permit for that purpose under *W. Va.Code*, 22–15–10(b) [1994].

As indicated above, under *W. Va. Code*, 22–15–10(b) [1994], it is unlawful for any person, unless the person holds a valid operation permit, to operate any solid waste facility. Accordingly, CAMC may not operate its solid waste facility,[22] including its new incinerator, until it receives a solid waste permit. To the extent this opinion conflicts with the consent order previously entered into between CAMC and the DEP allowing CAMC to operate the new incinerator pending consideration of its solid waste permit, such consent order is set aside.

## IV.

### *The West Virginia Medical Waste Act*

The West Virginia Medical Waste Act, *W. Va.Code*, 20–5J–1, *et seq.*, was enacted to regulate "the generation, handling, storage, transportation, treatment and disposal of medical waste" in this State. *W. Va.Code*, 20–5J–2 [1991], in part. According to *W. Va.Code*, 20–5J–2 [1991]:

The Legislature finds that the proper and environmentally-sound disposal of infectious and noninfectious medical waste is an important issue facing all West Virginians.

The Legislature further finds that effective controls for the management of medical waste are necessary to ensure the protection of the public health, safety and welfare, and the environment.

. . . .

The Legislature further finds that toxic pollutants emitted by medical waste incinerators are an important public health hazard.

. . . .

The Legislature further finds that safe and cost-effective alternatives to the incineration of infectious and noninfectious medical waste should be encouraged.

The Legislature further finds that the public interest is best served by:

(1) Efforts to reduce the volume of medical waste generated at all levels;

(2) On-site separation and treatment of infectious medical waste; [and]

(3) Treatment and disposal of infectious medical waste in local infectious medical waste management facilities [.]

. . . .

The Legislature further finds that local responsibility for the minimization in volume, and for the treatment and disposal of infectious and noninfectious medical waste

---

**21.** Likewise, 47 C.S.R. 38–3.5.1 [1996], not unlike *W. Va.Code*, 22–15–10(b) [1994], requires that *a permit* be obtained form the DEP "prior to the installation, establishment, construction, modification, operation, or closure of any solid waste facility." This rule, having been legislatively-approved,

has the force of a statute itself. Being an act of the West Virginia Legislature, it is entitled to more than mere deference; it is entitled to controlling weight. As authorized by legisla-

tion, a legislative rule should be ignored only if the agency has exceeded its constitutional or statutory authority or is arbitrary and capricious.

Syl. pt. 2, in relevant part, *HCCRA v. Boone Memorial Hospital*, 196 W.Va. 326, 472 S.E.2d 411 (1996).

**22.** *See* 47 C.S.R. 38–2.120 [1996] (defining "solid waste facility").

is an important part of a sound and rational waste management program.

. . . .

The Legislature further finds that noninfectious medical waste should be handled by environmentally-sound disposal technologies, and that alternative disposal technologies promoting safe recycling and limiting the need for incineration should be emphasized, developed and utilized.

*Id.*, in relevant part.

## A.

The first issue for our review under the West Virginia Medical Waste Act is whether CAMC was required to obtain a permit thereunder prior to construction of the incinerator at issue. Resolution of this issue requires careful analysis of the Act's statutory scheme and the regulations promulgated pursuant thereto.

*W.Va.Code*, 20–5J–5(b) [1991] provides:

On or after [October 1, 1991], *no person may* own, *construct, modify,* operate or close *any facility or site for the treatment, storage or disposal of infectious medical waste,* nor shall any person store, treat or dispose of any such infectious medical waste *without first obtaining a permit* from the secretary [of the DHHR], unless specifically excluded or exempted by rules promulgated by the secretary.

(emphasis added).

Similarly, 64 C.S.R. 56–4.1 [1993] and 64 C.S.R. 56–4.2 [1993] provide:

4.1. On or after [October 1, 1991], *no person may* own, *construct, modify* or operate *an infectious medical waste management facility,* nor shall any person store, transport, treat or dispose of any infectious medical waste *without first obtaining a permit* from the secretary [of the DHHR], unless exempted by Sections 2.1, 2.2 or

4.15 of this rule: Provided, however, That submission of an application for a permit under this rule within [45] days after the effective date of this rule shall be a rebuttable presumption of compliance with this rule until such time as the secretary grants or denies the permit.

4.2. *No person shall begin physical construction of a new infectious medical waste management facility without having received a permit.*

(emphasis added).

An "infectious medical waste management facility" is defined in 64 C.S.R. 56–3.10 [1993] as

an *infectious medical waste facility which generates, handles, processes, stores, treats or disposes of infectious medical waste, including all land and structures, other appurtenances, and improvements thereon,* used for infectious medical waste.

(emphasis added).

CAMC points out, and petitioners do not dispute, that the regulatory definition of the term "facility" is derived from federal and West Virginia hazardous waste management regulations. Specifically, 40 C.F.R. § 260.10 [1995], as adopted by reference in 47 C.S.R. 35–2, defines the term "facility" as:

All contiguous land, and structures, other appurtenances, and improvements on the land, used for treating, storing or disposing of hazardous waste. A facility may consist of several treatment, storage, or disposal operational units (e.g., one or more landfills, surface impoundments or combinations of them).

*Id.*, in relevant part.

CAMC maintains that, according to the above definitions, an incinerator, which *treats* infectious medical waste,[23] is a component of an infectious medical waste management facility. In addition to an incinerator, such a

---

**23.** 64 C.S.R. 56–10 [1993], "Methods of Treatment," provides:

10.1. General.

10.1.1. All infectious medical waste shall be treated by one of the following methods:

10.1.1.1. Incineration as described in Section 10.2 of this rule;

10.1.1.2. Steam treatment as described in Section 10.3 of this rule;

10.1.1.3. Discharge to a sanitary sewer as described in Section 10.4 of this rule; or

10.1.1.4. Any other alternative method approved in writing and permitted by the secretary according to the provisions of Section 10.5 of this rule.

facility consists of all land and structures, other appurtenances and improvements thereon, which generate, handle, process and store infectious medical waste. *Id.*[24]

The infectious medical waste management facility in this case, therefore, includes not only the incinerator at issue, but also CAMC's hospitals and other structures and improvements where infectious medical waste is generated and stored prior to being treated in the incinerator.

## B.

64 C.S.R. 56–4.4 [1993] sets forth the permit application requirements for infectious medical waste management facilities under the Medical Waste Act:

4.4 An application for a permit shall be submitted to the secretary in duplicate on forms prescribed by the secretary and shall include the following:

4.4.1. The name, mailing address, and location of the facility for which the application is submitted;

4.4.2. The name, address and telephone number of the owners of the facility;

4.4.3. The name, address, and telephone number of the manager of the facility, if different from the owner; and

4.4.4. A proposed infectious medical waste management plan as required by Section 5 of this rule.

Pursuant to 64 C.S.R. 56–4.5 [1993], permit applications for *new* infectious medical waste management facilities are required to include the following detailed information, in addition to the requirements set forth in 64 C.S.R. 56–4.4 [1993], above:

4.5 For new infectious medical waste management facilities, the application shall be accompanied by two (2) copies of a topographic map showing the facility and the area one thousand (1,000) feet around the facility site, which clearly shows the following:

4.5.1. The map scale and date;

4.5.2. Land uses (e.g., residential, commercial, agricultural, recreational);

4.5.3. The orientation of the map (north arrow);

4.5.4. The legal boundaries of the facility site;

4.5.5. Access control (fences, gates); and

4.5.6. Buildings to be used for treatment, storage, and disposal operations and other structures (e.g. recreation areas, run-off control systems, access and internal roads, storm, sanitary, and process sewerage systems, loading and unloading areas, fire control facilities).

■ As previously discussed, CAMC was an infectious medical waste management facility already in existence when the Medical Waste Act was enacted. In 1992, it applied for a permit under the Medical Waste Act, pursuant to *W. Va. Code*, 20–5J–5(b) [1991], 64 C.S.R. 56–4.1 [1993] and 64 C.S.R. 56–4.4 [1993]. Because CAMC was not a *new* infectious medical waste management facility when it applied for a permit in 1992, it was not required, in its permit application, to submit the detailed information set forth in 64 C.S.R. 56–4.5 [1993], above.

---

**24.** 64 C.S.R. 56–3.16 [1993] and 64 C.S.R. 56–3.17 [1993], defining the terms "off-site" and "on-site," respectively, further indicate that an "infectious medical waste management facility" consists of more than an incinerator unit:

Off-site—A facility or area for the collection, storage, transfer, processing, treatment, or disposal of infectious medical waste which is not on the generator's site, or a facility or area that receives infectious medical waste for storage or treatment that has not been generated on-site at that facility or area.

64 C.S.R. 56–3.16 [1993]. *See W. Va. Code*, 20–5J–3(9) [1991] (similarly defining "off-site").

On-site—The same or geographically contiguous property which may be divided by a public or private right-of-way, provided the entrance and exit between the properties is at a crossroads intersection and access is by crossing, as opposed to going along the right-of-way. Noncontiguous properties owned by the same person but connected by a right-of-way controlled by said person and to which the public does not have access, is also considered on-site property. Hospitals with more than one (1) facility located in the same county shall be considered one (1) site.

64 C.S.R. 56–3.17 [1993]. *See W. Va. Code*, 20–5J–3(10) [1991] (similarly defining "on-site").

## C.

In 1992, when CAMC originally applied for a permit under the Medical Waste Act, CAMC requested and was granted a waiver as to three incinerator operation requirements, pursuant to 64 C.S.R. 56–10.2.7 [1993] ("[f]acilities with incinerators in operation at the time this rule becomes effective may apply ... for a *waiver.* ... [which] .... *shall be contingent upon submission of plans to upgrade the facility* so as to be in full compliance with [64 C.S.R. 56–10.2.2 through 10.2.4] [.]" *Id.*, in relevant part. (emphasis added)). This waiver was, according to the language of 64 C.S.R. 56–10.2.7 [1993], granted on the condition that CAMC upgrade its facility, and in particular, its incinerator(s), to comply with the three incinerator operation requirements.[25] *See* n. 18, *supra.*

When CAMC filed its application to renew its infectious medical waste management facility permit for 1995–96, it submitted an Infectious Medical Waste Management Plan, as required by 64 C.S.R. 56–4.4.4 [1993],[26] as well as a letter, dated August 14, 1995, in which it informed the DHHR, *inter alia,* that it had been issued a permit by the DEP–OAQ to construct the incinerator at issue. In the August 14, 1995 letter, CAMC, by Safety Director Morris, asked the DHHR to advise it as to CAMC's "specific requirements for application applicable to this project." Safety Director Morris referred specifically to 64 C.S.R. 56–4.1 [1993]'s requirement that "no person may own, construct, modify, or operate an infectious medical waste management facility ... without first obtaining a permit[.]" *Id.*, in relevant part. As we have already indicated, the circuit court found, in its August 22, 1996 order, that the "DHHR informed CAMC that all that would be required for the upgrade [that is, the new incinerator] would be a[n] *[Infectious Medical Waste Management Plan] revision to be approved prior to operation.*" (emphasis added).

By application dated April 25, 1996, CAMC applied for renewal of its permit for 1996–97. This application indicated, on its face, that a new incinerator was being constructed at the General Division. As we have already noted, CAMC submitted a revised Infectious Medical Waste Management Plan, on or about August 8, 1996, indicating the changes to its plan "when the centralized incinerator currently under construction is operational[,]" and seeking approval thereof.[27] *See* n. 20, *supra.*

Under *W. Va. Code,* 20–5J–5(b) [1991], *supra,* and 64 C.S.R. 56–4.1, *supra,* no person may own, construct, modify, operate or close an infectious medical waste management facility without first obtaining a permit from the DHHR. As set forth above, 64 C.S.R. 4.4 through 4.4.4 [1993] provide the application requirements for such permit.[28] An infectious medical waste management facility permit application must include, among other information, "[a] proposed infectious medical waste management plan as required by [64 C.S.R. 56–5]." 64 C.S.R. 56–4.4.4 [1993]. The DHHR must approve this plan before it grants a permit to own, construct, modify, operate or close an infectious medical waste management facility.

■ Accordingly, we hold that under *W. Va. Code,* 20–5J–5(b) [1991] and 64 C.S.R. 56–4.1 [1993] no person may own, construct, modify, operate or close an infectious medical waste management facility without first obtaining a permit from the secretary of the Department of Health and Human Re-

---

**25.** The incinerator now under construction will be in compliance with these operating requirements.

**26.** "An application for a permit ... shall include ... [a] proposed infectious medical waste management plan [.]" 64 C.S.R. 56–4.4.4 [1993], in part.

**27.** Section 10.2.7 of CAMC's revised infectious medical waste management plan provided: "*Upon approval of this plan* and commencement of the operation of the replacement incinerator,

CAMC withdraws its request for a waiver of [64 C.S.R. 56–10.2.2 through 10.2.4] of the Infectious Waste Management rules[.]"

**28.** 64 C.S.R. 56–4.1 [1993] requires that a permit be obtained to own, construct, modify or operate an infectious medical waste management facility. The permit application and approval procedures contained in 64 C.S.R. 56–4.4 [1993] (and 64 C.S.R. 56–4.5 [1993], for new infectious medical waste management facilities) are to be followed when such permits are sought.

sources. According to 64 C.S.R. 56–4.4.4 [1993], an infectious medical waste management facility permit application must include, among other information, a proposed infectious medical waste management plan. The secretary of the Department of Health and Human Resources must approve this plan before he or she grants a permit to own, construct, modify, operate or close an infectious medical waste management facility.

In this case, CAMC submitted to the DHHR a revised infectious medical waste management plan which reflects the incinerator currently under construction and the changes to its plan once the incinerator is in operation. CAMC's plan was submitted in conjunction with its 1996–97 renewal permit application but after construction of the incinerator had already begun. By letter dated August 15, 1996, the DHHR indicated its approval of CAMC's revised infectious medical waste management plan. It is unclear from the record in this case whether the DHHR then issued to CAMC a permit which would allow CAMC to operate its new incinerator. CAMC may not operate the new incinerator until such time as it obtains this permit.

### V.

The remaining issue under the West Virginia Medical Waste Act is whether *W. Va. Code*, 20–5J–6(a)(9) [1994] requires the DHHR to promulgate regulations which provide for public participation in the permit application process for *noncommercial* infec-

tious medical waste management facilities[29] such as that operated by CAMC.

*W. Va.Code*, 20–5J–6(a)(9) [1994] provides:

(a) The secretary [of the DHHR] shall promulgate legislative rules, in accordance with ... [*W. Va.Code*, 29A–1–1 *et seq.*] ... necessary to effectuate the findings and purposes of this article. Said rules shall include, but not be limited to the following:

.    .    .    .    .

(9) Procedures for public participation in the implementation of this article[.]

Pursuant to *W. Va.Code*, 20–5J–6(a)(9) [1994], the DHHR promulgated 64 C.S.R. 56–11 [1993], which sets forth rather detailed procedures for public participation in the permit application process of *commercial* infectious medical waste facilities. In promulgating 64 C.S.R. 56–11 [1993], the DHHR maintains that it has complied with the requirements set forth in *W. Va.Code*, 20–5J–6(a)(9) [1994].

Petitioners argue, however, that *commercial* infectious medical waste management facilities, defined as "any infectious medical waste management facility at which thirty-five percent or more by weight of the total infectious medical waste stored, treated, or disposed of by said facility in any calendar year is generated off-site[,]" *W. Va.Code*, 20–5J–3(1) [1991], are, with few exceptions, expressly prohibited by statute. *See W. Va. Code*, 20–5J–4 [1991].[30] *Noncommercial* infectious medical waste management facilities,

29. " 'Noncommercial infectious medical waste facility' means any infectious medical waste facility at which less than thirty-five percent by weight of the total infectious medical waste stored, treated or disposed of by said facility in any calendar year is generated off-site." *W. Va. Code*, 20–5J–3(7) [1991].

30. *W.Va.Code*, 20–5J–4 [1991] provides:

*It shall be unlawful to construct or operate a commercial infectious medical waste facility in the state of West Virginia:* Provided, That the secretary may authorize an exception to this prohibition solely for facilities not utilizing incineration technology in any form, including the manufacture or burning of refuse derived fuel: Provided, however, That such an excep-

tion may be granted only following: (1) The promulgation of legislative rules, in accordance with the provisions of ... [*W. Va.Code*, 29A–1–1 et seq.] of this code, containing guidelines for such an exception that are being fully consistent with the findings and purposes contained in ... [*W. Va.Code*, 20–5J–2] ...; (2) a public hearing on the record in the region affected by the proposed facility; (3) an investigation of the infectious medical waste stream in the region affected by the proposed facility; and (4) a determination that programs to minimize and reduce the infectious medical waste stream have been implemented.
(emphasis added).

on the other hand, such as that operated by CAMC, are lawful and exceedingly more common in our communities.

As indicated above, the Medical Waste Act was enacted upon findings by the legislature that, *inter alia*, "effective controls for the management of medical waste are necessary to ensure the protection of the public health, safety and welfare, and the environment" and that "toxic pollutants emitted by medical waste incinerators are an important public health hazard." *W. Va. Code*, 20–5J–2 [1991], in part. These findings are applicable to noncommercial infectious medical waste management facilities, as well as to commercial ones. Moreover, *W. Va. Code*, 20–5J–6(a)(9) [1994] makes no distinction between commercial and noncommercial facilities in its requirement that the DHHR promulgate rules for procedures for public participation in the implementation of the Medical Waste Act.

Thus, petitioners essentially maintain that it was the legislature's intention that the DHHR promulgate rules which set forth procedures for public participation in the permit application process of the more prevalent noncommercial infectious medical waste management facilities, in addition to commercial facilities. In promulgating rules for public participation with regard to commercial infectious medical waste management facilities but not with regard to noncommercial facilities, the DHHR has only partially complied with the mandates of *W. Va. Code*, 20–5J–6(a)(9) [1994].

■ We hold that under *W. Va. Code*, 20–5J–6(a)(9) [1994], the secretary of the Department of Health and Human Resources shall promulgate legislative rules in accordance with the provisions of *W. Va. Code*, 29A–1–1, *et seq.* necessary to effectuate the findings and purposes of the West Virginia · Medical Waste Act, *W. Va. Code*, 20–5J–1, *et seq.* These rules shall include, but not be limited to, procedures for public participation in the implementation of this article. *W. Va. Code*, 20–5J–6(a)(9) [1994] requires the secretary of the Department of Health and Human Resources to promulgate legislative

rules setting forth procedures for public participation in the permit application process of noncommercial infectious medical waste management facilities.

We therefore order the DHHR to carry out its mandatory, nondiscretionary duty of promulgating legislative rules which set forth procedures for public participation in the permit application·process of noncommercial infectious medical waste management facilities.

As discussed above, CAMC has received approval of its revised infectious medical waste management plan which reflects the incinerator at issue. Though the record is unclear, it appears that the DHHR has not yet issued to CAMC a permit which would authorize operation of the incinerator.

■ Under these circumstances, we will not require the DHHR to delay issuance of CAMC's permit pending DHHR compliance with the requirement that it promulgate rules for procedures for public participation in the permit application process of noncommercial infectious medical waste management facilities, and legislative approval thereof.

## VI.

As indicated above, this Court previously granted petitioners' request for injunctive relief only as to operation of the incinerator at issue. In syllabus point 7 of *Jefferson Cty. Bd. of Educ. v. Jefferson County Educ. Ass'n*, 183 W.Va. 15, 393 S.E.2d 653 (1990), this Court set forth the following principles to be considered when determining whether an injunction should be granted:

' "The granting or refusal of an injunction, whether mandatory or preventive, calls for the exercise of sound judicial discretion in view of all the circumstances of the particular case; regard being had to the nature of the controversy, the object for which the injunction is being sought, and the comparative hardship or convenience to the respective parties involved in the award or denial of the writ." Point 4,

syllabus, *State ex rel. Donley v. Barker [Baker]*, 112 W.Va. 263 [164 S.E. 154 (1932) ].' Syllabus Point 2, *Severt v. Beckley Coals, Inc.*, 153 W.Va. 600, 170 S.E.2d 577 (1969).

This Court further stated that

'[u]nder the balance of hardship test the ... court must consider, in "flexible interplay," the following four factors in determining whether to issue a preliminary injunction: (1) the likelihood of irreparable harm to the plaintiff without the injunction; (2) the likelihood of harm to the defendant with an injunction; (3) the plaintiff's likelihood of success on the merits; and (4) the public interest.'

*Id.*, 183 W.Va. at 24, 393 S.E.2d at 662 (*quoting Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1054 (4th Cir.1985)).

As we have already concluded, CAMC is required to obtain a permit prior to operation of its solid waste facility, including the new incinerator, under *W. Va.Code*, 22–15–10(b) [1994]. The public is currently participating in that permit application process.[31] Moreover, under *W. Va.Code*, 20–5J–5(b) [1991], CAMC, whose revised infectious medical waste management plan has been approved by the DHHR, is required to obtain a permit from the DHHR which would allow it to operate the incinerator.

■ We find the above statutory permitting requirements to be mandatory and thus shall not be disregarded. As discussed above, the primary purpose of both the Solid Waste Management Act and the Medical Waste Act is to protect the public's health, safety and welfare, as well as the environ-ment. Though we recognize that this permitting process may impose a burden on CAMC, such burden does not outweigh the public's interest in the protection of its own health, safety and welfare.[32] We should note CAMC commendably sought to comply with the appropriate statutes, particularly with regard to the required permit under the Medical Waste Act.

Therefore, CAMC is enjoined from operating the incinerator at issue until such time as it obtains the required permits under *W. Va.Code*, 22–15–10(b) [1994] of the Solid Waste Management Act and *W. Va.Code*, 20–5J–5(b) [1991] of the Medical Waste Act.

## VII.

In conclusion, this Court grants petitioners' petition for writ of mandamus against the respondents herein and order them to perform their mandatory, nondiscretionary duties under the Solid Waste Management Act and the Medical Waste Act in accordance with the principles set forth in this opinion.

We further enjoin CAMC from operating the incinerator until such time as it obtains the proper permits from the DEP and the DHHR.

Writ granted as moulded; Injunctive relief granted.

RECHT, Judge, sitting by temporary assignment.

---

**31.** For example, a public hearing on the solid waste permit was scheduled to be conducted on November 21, 1996. *See* n. 10, *supra*.

**32.** We note that during oral argument before this Court, petitioners indicated that, in light of the fact that construction of the incinerator was near completion, their request for relief did not include that the incinerator be dismantled.