541 S.E.2d 326

Robert L. BOGGESS, Appellant,

v.

WORKERS' COMPENSATION DIVISION and Union Carbide Corporation, Appellees.

Robert L. Payne, Appellant,

v.

Workers' Compensation Division and Affiliated Transport, Inc., Montgomery Tank Lines and Chemical Leaman Tank Lines, Appellees.

Nos. 27056, 27057.

Supreme Court of Appeals of West Virginia.

Submitted April 18, 2000.

Decided July 13, 2000.

Concurring Opinion of Justice Starcher July 20, 2000.

Concurring Opinion of Chief Justice Maynard Dec. 5, 2000.

E. William Harvit, Harvit & Schwartz, Charleston, for Appellants Robert L. Boggess and Robert L. Payne.

John L. McClaugherty, Allen R. Prunty, Gretchen E. Pyles, Jackson & Kelly, Charleston, for Appellee Union Carbide Corporation.

H. Toney Stroud, Ancil G. Ramey, Steptoe & Johnson, Charleston, for Appellee Montgomery Tank Lines.

Allen R. Prunty, Gretchen E. Pyles, Jackson & Kelly, Charleston, for Appellee Chemical Leaman Tank Lines.

SCOTT, Justice:

The Appellants, Robert L. Boggess and Robert L. Payne, seek the reversal of final orders of the Workers' Compensation Appeal Board ("Appeal Board"), issued on September 30, 1999, concerning the Appellants' claims for occupational pneumoconiosis [1] benefits. The sole issue before this Court is whether Title 85 of the West Virginia Code of State Rules, Series 1, § 20.8.5(b) (1986), a legislative rule governing ventilatory function testing in occupational pneumoconiosis claims, requires exclusive use of the Kory predicted normal values for the interpretation of test results. We answer this query in the affirmative, and accordingly, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Evaluating Impairment of Pulmonary Function

In order to fully appreciate the facts of these consolidated cases, one needs at least a rudimentary understanding of how impairment of pulmonary function is evaluated under the workers' compensation law of this state. Impairment of pulmonary function, or breathing impairment, is assessed principally through ventilatory function testing. During this testing, the claimant exhales forcibly into an instrument called a spirometer. The spirometer records the "[v]olume of air that can be forcefully exhaled from the lungs after a maximal inspiration," known as the "forced vital capacity" (FVC), and the "[v]olume of air that can be exhaled forcefully from the lungs in one (1) second after a maximal inspiration," termed the "forced expiratory volume in one (1) second" ($FEV_1$). 85 W. Va.

1. West Virginia Code § 23–4–1 (1998) defines "occupational pneumoconiosis" as "a disease of the lungs caused by the inhalation of minute particles of dust over a period of time due to causes and conditions arising out of and in the course of the employment." The term includes the following diseases: "silicosis, anthracosilicosis, coal worker's pneumoconiosis, commonly known as black lung or miner's asthma, silico-tuberculosis (silicosis accompanied by active tuberculosis of the lungs), coal worker's pneumoconiosis accompanied by active tuberculosis of the lungs, asbestosis, siderosis, anthrax and any and all other dust diseases of the lungs and conditions and diseases caused by occupational pneumoconiosis" which meet the statutory definition. W. Va.Code § 23–4–1.

C.S.R. § 85–1–20.8.4 (effective July 1, 1986). Ventilatory function test results are expressed as actual scores and as percentages of "predicted normal values" (e.g., FVC percent of predicted), which values are derived from a statistical analysis of persons with "normal" breathing. Once test results are obtained, the degree of breathing impairment is determined in accordance with the Table for Impairment of Pulmonary Function (Table 85–1A). 85 W. Va.C.S.R. § 85–1A–20.8.7.[2]

The results of ventilatory function tests performed by Appellants Boggess and Payne were interpreted against two sets of predicted normal values: the Kory predicted normal values and the Morris predicted normal values. The Kory predicted normal values were established in 1961 by Ross C. Kory, M.D., and others, who tested the breathing of 468 "normal men" at fifteen medical facilities of the U.S. Army and the U.S. Veteran's Administration. The legislative rule now in question—section 20.8.5(b)—was adopted by the Legislature in 1986,[3] and since then, the Occupational Pneumoconiosis Board ("OP Board"), has used only the Kory predicted values to interpret the results of ventilatory function tests. The Morris predicted normal values were derived from a study published in 1971 by J.F. Morris, M.D., and associates. The Morris study population was rural, consisted of 517 nonsmoking men and 471 nonsmoking women, ages twenty to eighty-four, and contained a large number of Mormons. Test results obtained by Dominic Gaziano, M.D., and submitted by the Appellants in the administrative proceedings below, were calculated using the Morris predicted values.

## B. Boggess' Claim

On December 23, 1992, Appellant Robert L. Boggess, a former employee of Appellee Union Carbide Corporation, filed an application for occupational pneumoconiosis benefits. On January 7, 1994, the Workers' Compensation Commissioner ("Commissioner") granted Boggess a 5% permanent partial disability award based on findings of the OP Board, dated December 9, 1993, in which the OP Board diagnosed occupational pneumoconiosis with no pulmonary functional impairment.

In March 1997, Boggess filed a petition to reopen his claim for additional permanent partial disability consideration. Attached to his petition was a report by Dr. Gaziano. The report documented a pulmonary function test which was administered to Boggess on February 22, 1997, and which produced an actual FVC of 3.31 and a FVC percent of predicted of 74%, using the Morris predicted normal values. At the conclusion of the report, Dr. Gaziano opined that Boggess "has asbestosis with a mild degree of pulmonary functional impairment."

The Workers' Compensation Division ("Division") reopened Boggess' claim, and on September 18, 1997, ventilatory function tests were performed for the OP Board. The tests revealed an actual FVC of 3.11 and a FVC percent of predicted of 75%, using the Kory predicted normal values. Based in part on the test results, the OP Board, in a statement of findings dated September 18, 1997, diagnosed occupational pneumoconiosis with 10% pulmonary functional impairment, representing an additional 5% impairment above

---

**2.**

| % IMPAIRMENT | 0 | 10 | 15 | 20 | 25 | 30 | 40 | 50 | 60 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| FVC % PRED. | 80 | 75 | 70 | 67 | 64 | 61 | 58 | 55 | 52 | 50 |
| $FEV_1$ 0% PRED. | 75 | 73 | 70 | 67 | 64 | 61 | 58 | 55 | 52 | 50 |
| $FEV_1$ 0/FVC | 75 | 73 | 70 | 67 | 64 | 61 | 56 | 51 | 48 | 45 |
| MVV 1% PRED. | 80 | 75 | 70 | 67 | 64 | 61 | 58 | 55 | 52 | 50 |

85 W. Va.C.S.R. § 85–1A–20.8.7, in part.

**3.** In 1985, the Commissioner adopted a set of emergency administrative rules governing the evaluation of medical evidence submitted in occupational pneumoconiosis claims. During the regular legislative session in 1986, the Commissioner's emergency rules were modified and adopted by the West Virginia Legislature as legislative rules. *See Boyd v. Merritt,* 177 W.Va. 472, 473–74, 354 S.E.2d 106, 107–08 (1986). Section 20.8.5(b) was among the legislative rules so created.

that previously found in Boggess' claim. In accordance with the OP Board's findings, the Division granted Boggess an additional 5% award in a decision dated November 19, 1997.

The Division's November 19, 1997, decision was protested by both Boggess and Union Carbide Corporation. On January 20, 1999, a hearing was held before an Administrative Law Judge ("ALJ") for the purpose of taking the testimony of members of the OP Board. At the hearing, James H. Walker, M.D., chairman of the OP Board, testified that his opinion had changed subsequent to the issuance of the OP Board's September 1997 findings due to a report from the Occupational Lung Center, which was submitted by Union Carbide. The Occupational Lung Center report compared the actual test results documented in Dr. Gaziano's February 22, 1997, report to the Kory predicted normal values and showed, among other things, that Boggess' FVC percent of predicted was 78%. According to Dr. Walker, the percentages contained in the Occupational Lung Center report represent normal ventilatory function. Dr. Walker credited Dr. Gaziano's test results over the OP Board's September 18, 1997, results because higher actual volumes were recorded during Dr. Gaziano's testing. As stated at the hearing, Dr. Walker's opinion was that Boggess had been fully compensated by the original 5% award. OP Board members Jack L. Kinder, Jr., M.D., and Thomas M. Hayes, M.D., agreed with Dr. Walker's testimony.

In a decision dated March 2, 1999, an ALJ reversed the Division's November 19, 1997, decision and ordered that Boggess be granted no additional award beyond the original 5% permanent partial disability award. On September 30, 1999, the Appeal Board affirmed the ALJ's decision.

### C. Payne's Claim

Appellant Payne, a retired plant worker, filed an application for occupational pneumoconiosis benefits on September 27, 1995. He was examined by the OP Board on November 7, 1996. Ventilatory function tests were conducted and resulted in an actual FVC of 3.15. Applying the Kory predicted normals, a FVC percent of predicted of 78% was

generated. Based on the test results and other evidence, the OP Board, in its findings dated November 7, 1996, stated that it could not make a diagnosis of occupational pneumoconiosis. In accordance with the OP Board's findings, the Division issued an order on January 7, 1997, refusing to grant an award.

Payne and Appellee Montgomery Tank Lines protested the Division's order. In support of his protest, Payne submitted the results of ventilatory function tests which were administered at Dr. Gaziano's direction in June 1995. These tests yielded an actual FVC of 3.20 and a FVC percent of predicted of 73%, using the Morris predicted normal values. At a hearing before an ALJ on January 27, 1999, Dr. Walker testified that neither the test results obtained by Dr. Gaziano in June 1995 nor the OP Board's tests in November 1996 supported any degree of impairment of pulmonary function. Dr. Kinder agreed with Dr. Walker. After the hearing, the matter was submitted for a decision. In a decision dated March 19, 1999, an ALJ affirmed the Division's January 7, 1997, order. Payne appealed, and by order dated September 30, 1999, the Appeal Board affirmed the ALJ's decision.

### II. STANDARD OF REVIEW

■■ In deciding whether to uphold the Appeal Board's decision, we apply the standard of review which this Court adopted in syllabus point two of *West Virginia Health Care Cost Review Authority v. Boone Memorial Hospital,* 196 W.Va. 326, 472 S.E.2d 411 (1996):

> Once a disputed regulation is legislatively approved, it has the force of a statute itself. Being an act of the West Virginia Legislature, it is entitled to more than mere deference; it is entitled to controlling weight. As authorized by legislation, a legislative rule should be ignored only if the agency has exceeded its constitutional or statutory authority or is arbitrary or capricious.

### III. DISCUSSION

■ The focal point of this controversy is section 20.8.5(b), a legislative rule which con-

trols ventilatory function testing in occupational pneumoconiosis claims. The pertinent portion of the rule states:

The effort [of a claimant undergoing a ventilatory function test] shall be judged unacceptable and cannot be considered in evaluating pulmonary functional impairment when the subject:

(1) *Has* not reached full inspiration preceding the forced expiration; *or*

(2) *Has* not used maximal effort during the entire forced expiration; *or*

(3) *Has* not continued the expiration for at least five (5) seconds or until an obvious plateau in the volume-time curve has occurred; *or*

(4) *Has* an obstructed mouthpiece or a leak around the mouthpiece (obstruction due to tongue being placed in front of mouthpiece, false teeth falling in front of mouthpiece, etc.); *or*

(5) *Has* coughed or closed his glottis; *or*

(6) *Has* an unsatisfactory start of expiration, one characterized by excessive hesitation (or false starts), and therefore did not allow back extrapolation of time zero (0) (extrapolated volume on the volume-time tracing must be less than ten percent (10%) of the FVC); *or*

(7) *Has* an excessive variability between the three (3) satisfactory curves. The variation between the two (2) largest $FEV_1$'s of the three (3) satisfactory tracings should not exceed seven percent (7%) of the largest FEV1 or one hundred (100) ml, whichever is greater.

(8) Predicted values are derived from Kory's Nomogram.

85 W. Va.C.S.R. § 85–1–20.8.5(b) (emphasis added). The Appellant argues that section 20.8.5(b) does not require the exclusive use of the Kory predicted normal values and actually prohibits their use. Conversely, the Appellees contend that the rule requires the exclusive use of the Kory predicted normals for the interpretation of ventilatory function tests.

Upon examination of the rule, we find the requirement that the Kory nomogram (i.e., Kory predicted normal values) be utilized exclusively in assessing the results of ventilatory function tests to be manifest. Section 20.8.5(b) states that a claimant's effort in performing a ventilatory function test shall be unacceptable when the subject does one of seven listed actions. The description of each action starts with the word "has," and each act is separated from the next one in the list by a semicolon and the word "or," with the exception of the seventh act, which is followed by a period. After the period, a sentence numbered "(8)" states: "Predicted values are derived from Kory's Nomogram." Clearly, this statement is not part of the list of unsuitable actions by a claimant during testing and was instead intended by the Legislature as a separate subpart of section 20.8.5, requiring use of the Kory predicted normals to evaluate ventilatory function test results. We will not allow the obvious clerical error in the numbering of the rule to subvert this legislative intent. As this Court has previously stated, "where it is apparent that a clerical error has been made in the drafting of legislation which renders its meaning obscure, we will correct such clerical error." *McClanahan v. Putnam County Comm'n*, 174 W.Va. 478, 481, 327 S.E.2d 458, 462 (1985). Accordingly, we hold that Title 85 of the West Virginia Code of State Rules, Series 1, § 20.8.5(b) requires exclusive use of the Kory predicted normal values for interpreting the results of ventilatory function tests in occupational pneumoconiosis claims.

■ Our ruling accords proper deference to the Commissioner's interpretation of section 20.8.5(b). In syllabus point four of *State ex rel. ACF Industries, Inc. v. Vieweg*, 204 W.Va. 525, 514 S.E.2d 176 (1999), we held:

Interpretations as to the meaning and application of workers' compensation statutes rendered by the Workers' Compensation Commissioner, as the governmental official charged with the administration and enforcement of the workers' compensation statutory law of this State, pursuant to W. Va.Code § 23–1–1 (1997) (Repl.Vol. 1998), should be accorded deference if such interpretations are consistent with the legislation's plain meaning and ordinary construction.

Because a legislative rule "has the force of a statute itself," the foregoing precept is appli-

cable here. *Boone Mem'l Hosp.*, 196 W.Va. at 328, 472 S.E.2d at 414, syl. pt. 2, in part. As indicated in the Appeal Board's orders, the Commissioner's longstanding policy has been to require exclusive use of the Kory predicted values. Pursuant to this policy, the OP Board has used the Kory nomogram for assessing ventilatory function test results ever since section 20.8.5(b) was adopted. Because the Commissioner's interpretation of section 20.8.5(b) is consistent with the rule's plain meaning and ordinary construction, the holding in this case was reached with deference to that interpretation.

■ Appellants also argue that if section 20.8.5(b) requires use of the Kory predicted normal values, then the rule is unconstitutional as violative of substantive due process principles. No constitutional deficiency is apparent from the language of the rule itself. While Appellants' allegation of constitutional infirmity might have been developed below with an appropriate evidentiary showing, it was not. Due process arguments based upon inherent defects in the Kory predicted values would need support from the scientific community, which Appellants did not present to the ALJs or the Appeal Board. Therefore, under this Court's well-established "raise or waive" rule, we decline to consider today whether section 20.8.5(b) is constitutional. *See* Syl. Pt. 4, *State v. Browning*, 199 W.Va. 417, 485 S.E.2d 1 (1997) ("This Court will not consider an error which is not properly preserved in the record nor apparent on the face of the record.")

## IV. CONCLUSION

For the foregoing reasons, we affirm the September 30, 1999, final orders of the Appeal Board.

Affirmed.

Chief Justice MAYNARD and Justice STARCHER concur and file a concurring opinions.

Justice McGRAW dissents.

STARCHER, Justice, concurring.

(Filed July 20, 2000)

The majority opinion is dead-on right in its holding that the regulation being disputed in this case, 85 C.S.R. 1, § 20.8.5(b), requires the Workers' Compensation Division to use the Kory nomogram in evaluating a claimant's impairment. However, I firmly believe that the use of the Kory study flagrantly violates the equal protection rights of claimants, and undermines the purpose of the Workers' Compensation Act.

What is the Kory nomogram? The majority opinion does not clearly state what the Kory study is, and why it is so problematic. Nearly 40 years ago, Dr. Ross C. Kory gathered 468 "normal" men together at U.S. Army and Veteran's Administration Hospitals. Kory had his test subjects breathe into a machine, a "spirometer," and measured how fast and how much each man could breath in and out. Kory then made a graph based upon the age and height of these test subjects. Using the age and height of a patient, a doctor could look at the Kory graph—a "nomogram"—and predict the average breathing ability of the patient.[1] *See* Ross C. Kory, et al., "The Veterans Administration—Army Cooperative Study of Pulmonary Function," 30 Am.J.Med. 243 (1961).

Here's the problem: Kory's study contained men who smoked cigarettes and other tobacco products. Nowhere in the study does Kory filter out or account for the effects of smoking on breathing ability. Other doctors who *did* later account for smoking in similar studies discovered that smokers have a significantly, measurably lower breathing capacity than non-smokers.

In sum, Kory's study is terminally flawed because it does not show the average breathing ability of "normal men." Instead it shows the average breathing ability of a group of men, many of whom were likely to be smokers. While Kory may not have fully understood that smoking was a serious medi-

---

1. For example, claimant Robert L. Boggess was a 60–year–old man who was 5 feet, 9 inches tall. According to Kory's study, breathing out as long and hard as he could, Mr. Boggess should have been able to exhale 4.26 liters of air. In a test performed on February 22, 1997, Mr. Boggess actually exhaled 3.31 liters of air—or 78% of his predicted capacity. Using the Division's regulations, this computes to a 10% impairment of breathing capacity.

cal problem in 1961,[2] anyone with any sense today realizes that smoking has a devastatingly toxic effect on lung tissue.[3]

Because the Kory nomogram is basically a chart showing the expected breathing capacity of a group of persons likely to include a very large number of smokers, it is particularly unfair in making workers' compensation disability determinations. A perfect analogy to Kory would be doing a study of "normal men" at a Veteran's Hospital, many of whom are healthy, muscular men with experience strolling through minefields and who coincidentally are "randomly" found in the amputee ward, and concluding that the average man has one leg. If such a study were used in the workers' compensation context, we could conclude that every worker who lost a leg was perfectly healthy, because the average "normal" man only has one leg. This sounds absurd, but this is why Kory's nomogram has fallen into disuse in the medical community.

The fact that Kory's study has been thoroughly discredited in the medical community[4] has not stopped the Workers' Compensation Division from adopting the study as its "baseline" for the average, predicted breathing values for claimants. It is a fundamental principle of administrative law that the Workers' Compensation Division is charged with interpreting, administering, and enforcing the Workers' Compensation Act, and this Court will afford the Division substantial deference in its interpretation of the Act. Syllabus Point 4, *State ex rel. ACF Industries, Inc. v. Vieweg*, 204 W.Va. 525, 514 S.E.2d 176 (1999). The regulation drafted by the Division to adopt Kory, while full of clerical errors, is therefore properly interpreted by the majority opinion to require that Kory be used as the baseline for determining whether a claimant is disabled. *McClanahan v. Putnam Co. Comm'n*, 174 W.Va. 478, 481, 327 S.E.2d 458, 462 (1985).

That being said, it is just as clear that the Division's use of Kory violates basic constitu-

**2.** Let's face it: a very high percentage of post-World War II veterans were smokers, because the military distributed cigarettes to servicemen for free. Historians routinely relate stories of how, when paratroopers and soldiers were preparing to hit the Normandy beaches on D–Day in June 1944, they were each issued a carton of cigarettes. Many soldiers who had never smoked learned to smoke those free cigarettes in the intense combat that followed the invasion. *See, e.g.*, Stephen E. Ambrose, *D–Day, June 6, 1944: The Climatic Battle of World War II* (Touchstone, 1944).

Furthermore, Dr. Kory likely had a different viewpoint about smoking than doctors would today because, in the 1940s, 1950s and 1960s, cigarette companies were hiring doctors to promote and encourage tobacco usage. As one cigarette company touted, "More doctors smoke Camels than any other cigarette." Chesterfield cigarettes would "cause no ills," while Old Gold cigarettes asked smokers: "Why risk sore throats?" A "medical specialist" hired by Chesterfield certified that "the ears, nose, throat and accessory organs ... were not adversely affected ... by smoking the cigarettes provided." When tobacco companies started placing filters on cigarettes, Viceroy said that "filtered smoke is better for your health," while the new L & M filter was "just what the doctor ordered."

**3.** *See, e.g.*, Douglas W. Dockery, *et al.*, "Cumulative and Reversible Effects of Lifetime Smoking on Simple Tests of Lung Function in Adults," 137 Am.Rev.Resp.Dis. 286, 289–90 (1988) ("Many epidemiologic studies have found a pro-

gressive relative loss of pulmonary function with cumulative smoking.... Changes in pulmonary function have been observed even among smokers with very short durations of smoking.... Several studies have shown that smoking a single cigarette causes an immediate increase in airway resistance and a decrease in expiratory flow.")

**4.** A 1990 survey of 139 institutions with respiratory disease training programs in the United States and Canada found that only 5% used the Kory study. *See* Anthony J. Ghio, *et al.*, "Reference Equations Used to Predict Pulmonary Function: Survey at Institutions with Respiratory Disease Training Programs in the United States and Canada," 97 Chest 400 (1990).

The study advocated by the claimants' counsel, the "Morris" standard, was used by 47% (65 of 139) of the institutions. *See*, J.F. Morris, *et al.*, "Spirometric Standards for Healthy Nonsmoking Adults," 103 Am.Rev.Resp.Dis. 57 (1971); J.F. Morris, *et al.*, "Normal Values for the Ratio of One Second Forced Expiratory Volume to Forced Vital Capacity," 108 Am.Rev.Resp.Dis. 1000 (1973). Only 19% of the institutions used the "Crapo" standard, and 17% used the "Knudsen" nomogram. *See* Robert O. Crapo, *et al.*, "Reference Spirometric Values Using Techniques and Equipment that Meet ATS Recommendations," 123 Am.Rev.Resp.Dis. 659 (1981); R.J. Knudsen, *et al.*, "Changes in the Normal Maximal Expiratory Flow–Volume Curve with Growth and Aging," 127 Am .Rev.Resp.Dis. 725 (1983).

tional rights, particularly the right to equal protection. *See W.Va. Const.*, Art. III, § 10. A citizen's right to workers' compensation benefits is an economic right, *State ex rel. Blankenship v. Richardson*, 196 W.Va. 726, 734, 474 S.E.2d 906, 914 (1996), and this Court will examine the Legislature's actions to see whether the economic legislative "classification is a rational one based on social, economic, historic or geographic factors, whether it bears a reasonable relationship to a proper governmental purpose, and whether all persons within the class are treated equally." Syllabus Point 4, in part, *Gibson v. West Virginia Department of Highways*, 185 W.Va. 214, 406 S.E.2d 440 (1991).

I can perceive no rational basis for why an injured workers' compensation claimant must be measured against another injured person—like Kory's "smokers"—to determine the extent of the claimant's disability.[5] Comparing an impaired occupational pneumoconiosis claimant to an impaired smoker in Kory's study so as to conclude—not surprisingly—that the claimant has no breathing impairment has absolutely no proper governmental purpose.[6]

The claimants in the instant case are, in my opinion, correct in arguing that the application of the Kory nomogram to measure the extent of their breathing impairment violated equal protection. Unfortunately, they should have made the argument below, to either an administrative law judge or the Workers' Compensation Appeal Board. Only when an issue is clear will this Court pass upon the constitutional validity of a statute or regulation. A claimant should, upon a sufficient showing, be able to demonstrate below that the use of the Kory standard violates his or her constitutional rights. But this Court is not the proper forum for initiating such an argument.

The Workers' Compensation Act was not designed by the Legislature to be a complicated procedural swamp where claimants are stripped of benefits by an innocuous sounding tool called the "Kory nomogram." The Act was designed so that claimants would give up their right to a tort remedy against their employer, and in return receive a prompt, fair payment of their medical expenses, a portion of their wages, and a set sum for any permanent workplace injuries. By adopting the Kory nomogram, the Division has established a standard such that claimants measured against the Kory nomogram are denied medical benefits and denied any payment for their work related injuries. The use of the Kory study by the Division therefore undermines the beneficent purposes of the Act.

I therefore begrudgingly concur in the majority opinion—but hope that, in the future, claimants will begin their assault on the constitutionality of 85 C.S.R. 1, § 20.8.5(b) by making a record before an administrative law judge.

---

**5.** Kory's study examined only 468 "male subjects ... selected from hospital employees, patients, medical students, resident and full-time physicians of the participating hospitals." This is, by no means, a representative cross-section of society. For instance, I can find no discussion in the Kory study of factors such as race, gender, or national origin of the test subjects—all factors which can affect the outcome of pulmonary function testing, and all factors which implicate an equal protection analysis.

It also appears that Kory did not account for geographic factors such as the altitude of the test, exposure by the test subjects to environmental and occupational pollution, and socioeconomic status. The body and head position of the test subjects, as well as the time of day that the tests were conducted, are also not discussed. All of these factors can alter a test subject's breathing results. *See* American Thoracic Society, "Lung Function Testing: Selection of Reference Values

and Interpretive Strategies," 144 *Am.Rev. of Resp. Disease* 1202, 1203–1205 (1991).

**6.** I believe that there was a purpose behind adopting Kory: limiting every occupational pneumoconiosis claimant's ability to recover benefits for their injury. Most claimants—in fact, most claimants' counsel—simply do not understand Kory. They must rely upon the expertise of the Occupational Pneumoconiosis Board in interpreting any breathing tests. While the claimant's own doctor, using a standard other than Kory, may say the claimant is impaired, when the Occupational Pneumoconiosis Board tells the claimant he or she is not impaired (*sub silentio*, because of Kory), the claimant can only shrug in confusion and say, "Well, that's the Occupational Pneumoconiosis Board for you." In other words, the Division's adoption of the Kory nomogram has a purpose—it's just not a valid, decent, fair or constitutional purpose.

MAYNARD, Chief Justice, concurring.

(Filed Dec. 5, 2000)

I agree with the Court's construction of Title 85 of the West Virginia Code of State Rules, Series 1, § 20.8.5(b). I write separately to highlight my belief that the Kory standard for interpreting the results of ventilatory function tests in occupational pneumoconiosis claims is bad and unfair to workers. However, the decision to use the Kory standard is a legislative matter, and courts must not legislate no matter how much we do not like the statute or rule in question.